The STATE of Ohio, Appellee,

v.

IRWIN, Appellant.

[Cite as *State v. Irwin,* 184 Ohio App.3d 764, 2009-Ohio-5271.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 07–CO–22.

Decided Sept. 30, 2009.

772

Robert Herron, Columbiana County Prosecuting Attorney, and Ryan P. Weikart, Assistant Prosecuting Attorney, for appellee.

Robey & Robey and Margaret Amer Robey, for appellant.

DONOFRIO, Judge.

{¶ 1} Defendant-appellant, Andrew Irwin, appeals from a Columbiana County Common Pleas Court judgment convicting him of murder following a jury trial and from a judgment overruling his motion for a new trial.

{¶ 2} Appellant suffers from drug addiction. His heroin dealer was 21-year-old Emily Foreman. At 3:57 p.m. on August 23, 2006, appellant placed a phone call to 9-1-1 requesting an ambulance to the home where Foreman lived with her mother. At 4:10 p.m., appellant called the East Liverpool Police Department, once again requesting an ambulance. He told the dispatcher that his name was "Andy" and that there had been a stabbing. East Liverpool Police Officers Kelsey Hedrick and Fred Flati arrived on the scene, as did the paramedics. As the officers approached the house, appellant exited, shirtless and covered in blood. Appellant told the officers, "She's in there," and pointed inside the house. Appellant then sat on the front steps of the house.

{¶ 3} The police and paramedics located Foreman lying on the floor of a ransacked, blood-covered bedroom. She had several stab wounds and was bleeding. Foreman was able to tell the officers her name and that she could not breathe, but they did not ask her who had stabbed her. The paramedics transported Foreman to East Liverpool City Hospital, where she died as a result of stab wounds that punctured her lungs.

{¶ 4} According to paramedic Jason Lively, when he asked appellant what happened, appellant said that "she" attacked him, so he stabbed her, and the knife was inside the house. Appellant denied ever making this statement.

{¶ 5} Officer Hedrick questioned appellant in the living room of the house. According to Officer Hedrick, appellant told him that his name was "Andy" and said, "I came here to buy dope and she tried to stab me." Appellant denied making this statement also.

{¶ 6} Upon discovering that there was an outstanding warrant for appellant's arrest, police took him into custody on the warrant. Before he was handcuffed, appellant took a small, clean paring knife out of his pocket and tossed it on the

couch. The large serrated steak knife used to stab Foreman was still in the bedroom, covered with blood.

{¶ 7} Officer Hedrick, along with Chief Michael McVay, transported appellant to the police station. In the cruiser, appellant stated that he had treated his mother badly and mentioned being in rehab for drug use. He then stated that he hoped God and his child could forgive him.

{¶ 8} Upon searching Foreman's house, police observed that the bedroom where she was stabbed was in disarray. Her purse was dumped out. The bed was knocked out of alignment. A serrated knife was on the bed. Bloodstains were in numerous places. Additionally, in the kitchen, police found a hypodermic needle, a cell phone with bloodstains, and a wax-like material common in the storage of heroin.

{¶ 9} Fingerprint and DNA evidence indicated that appellant had been inside Foreman's house.

{¶ 10} A Columbiana County grand jury indicted appellant on one count of murder, a first-degree felony, in violation of R.C. 2903.02(A).

{¶ 11} The matter proceeded to a jury trial. At the close of the state's case, appellant asked to present newly discovered evidence that a man had telephoned his family the previous night and told them that someone else had confessed to the murder. The trial court denied this request and informed appellant that if the jury found him guilty, he could file a motion for a new trial. Additionally, during the trial, after repeated admonitions, the court twice found appellant's counsel in contempt for repeatedly refusing to follow its orders.

{¶ 12} The jury found appellant guilty as charged. The trial court then sentenced appellant to 15 years to life in prison.

{¶ 13} Appellant subsequently filed a motion for a new trial. The trial court held a two-day hearing on the motion, during which appellant presented numerous witnesses. One witness, Jason Beaver, testified that a man named Greg Todd confessed to him that he had been the one who stabbed Foreman and that he could not believe that appellant was taking the blame for him. Todd, however, was also called as a witness. Todd denied this confession and testified that he had nothing to do with Foreman's stabbing. Another witness, Julie Conyer, testified that her ex-boyfriend Tommy Shields told her that Todd had confessed to him while the two were incarcerated together. Shields, however, denied ever making such a statement.

{¶ 14} The trial court subsequently denied the new-trial motion. It stated that it found Todd's testimony to be the most reliable. It noted that Todd's testimony was extensive and convincing. The court further noted that the parties submitted the results of polygraph tests that both Todd and Beaver had taken. The

results indicated that Todd was being truthful in denying responsibility for the murder, while Beaver was not being truthful in stating that Todd had confessed to the murder.

{¶ 15} Appellant filed a timely notice of appeal from both his judgment entry of conviction and from the denial of his new-trial motion.

{¶ 16} Appellant raises 12 assignments of error. We will address them out of order for ease of discussion.

{¶ 17} Appellant's seventh assignment of error states:

{¶ 18} "Appellant's right to due process and impartial jury under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court unreasonably limited his attorney's opportunity to question potential jurors during voir dire and refused to dismiss biased jurors for cause."

{¶ 19} Here, appellant asserts that the trial court rushed his counsel through voir dire and did not give him adequate time to connect with the jury and learn their views on relevant issues. He argues that the court's constant interruptions and corrections, coupled with its 90-second inquiry-limit per juror, unreasonably limited voir dire and prejudiced his right to a fair trial.

{¶ 20} During voir dire, the trial court interrupted appellant's counsel on numerous occasions to move the process along. Appellant's counsel was not very articulate and he seemed, at times, to confuse the potential jurors with his questions. For instance, appellant's counsel spent some time trying to ask juror Kimmel whether she could find appellant not guilty if she had reasonable doubt. Kimmel repeatedly told him that she could not answer his questions because she was not familiar with the situation. The court then stepped in and clarified what counsel was attempting to ask Kimmel, that being, if the state failed to prove its case beyond a reasonable doubt, would she have any problem finding appellant not guilty. Kimmel was then able to answer the question.

{¶ 21} Additionally, appellant's counsel spent a considerable amount of time making speeches to the jury. For instance, counsel lectured the jurors about military service, police stations, and following orders. The court eventually interrupted counsel and instructed him to stop making the speeches, to refer to the questionnaires, and to ask the jurors questions. The following colloquy then transpired:

{¶ 22} "THE COURT: * * * If you have a question, you ask[,] and you want to remember, this jury, each one, has said that they can be fair already. * * * Now we're going to move this along. Do you understand?

{¶ 23} "MR. GEORGE KAFANTARIS: I'm not going to assume nothing, Your Honor. You assume a lot of things in your questioning.

{¶ 24} "THE COURT: Then you'll be sitting down and I'll pick this jury. Get to it."

{¶ 25} Counsel then spent a considerable amount of time discussing one juror's family and the presumption of innocence. He moved into a discussion about drugs with the juror. The court finally cut counsel off when he began to describe his conversation with a federal agent about the number of drug arrests in the area. The court told counsel he should move on to some group questions to move things along. The court told counsel the jurors had "indicated they can be fair."

{¶ 26} Counsel then went back to questioning each juror in a tedious manner about reasonable doubt. The court instructed counsel:

{¶ 27} "This jury already knows that you didn't look at the questionnaires ahead of time. You're asking lots of questions that are—the information about which are already on those questionnaires.

{¶ 28} "Now, this jury has already said, under questioning—my questions and the prosecuting attorney's questions—they've said that they can be fair and impartial. You want to make sure—'cause if peo—you know, this is a little different county for you, and I hope this is helpful. We don't want to insult these folks. We don't want to make them think that we doubt their answers to our prior questions, that they can be fair and impartial. So I would say that to you in a cautionary manner.

{¶ 29} "Now I want to move this thing along. My goal is to have a jury by noontime in this case, and I'll be disappointed if we don't have one.

{¶ 30} "The rules very clearly say that I can pick this jury. You're—I'm allowed to give you reasonable inquiry. But you've had more than reasonable inquiry.

{¶ 31} " * * *

{¶ 32} "Well, we're going to pick a jury by noon. You're either going to pick it or I'm going to pick it, okay?"

{¶ 33} Finally, the court resorted to limiting the questioning of individual jurors to 90 seconds per juror. This time limit applied both to appellant's counsel and to the prosecutor. And the time limit applied only to the last four jurors called into the jury box.

{¶ 34} Crim.R. 24(B) deals with the examination of prospective jurors and states in part: "The court may permit the attorney for the defendant * * * and the attorney for the state to conduct the examination of the prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the state and defense to supplement the examination by further inquiry." Accord R.C. 2945.27.

{¶ 35} A trial court has discretion over the scope, length, and manner of voir dire and may reasonably limit an attorney's voir dire. *State v. Abuzahrieh,* 8th Dist. No. 82689, 2003-Ohio-6639, 2003 WL 22922995, at ¶ 12, citing *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, at ¶ 46, and *State v. Edmonds* (Apr. 11, 1991), 8th Dist. No. 58417, 1991 WL 53845. The scope of voir dire varies with the circumstances. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. When examining whether the trial court abused its discretion in limiting voir dire, we are to simply look at whether the limitation was reasonable. Id.

{¶ 36} In this case, the trial court's limitations were reasonable. The only times the trial court interrupted appellant's counsel were when counsel seemed to be confusing the juror whom he was questioning. The court would then step in and attempt to clarify counsel's question. After the question was clarified, counsel would resume questioning. Additionally, while the court did eventually impose a 90–second limit on the individual questioning of each juror, this restriction was fair and reasonable under the circumstances. The court applied the 90–second limit to both appellant's counsel and to the prosecutor. And the time limit applied only to the last four jurors. The court imposed the time limit only after counsel refused to follow the court's suggestions to refer to the jury questionnaires, ask relevant questions, and refrain from making speeches. Given these circumstances, the court's limitations on voir dire were reasonable.

{¶ 37} Appellant additionally contends that the court should have dismissed for cause jurors Moore and Kimmel. He notes that Moore stated that he did not like anyone associated with drugs and Kimmel was acquainted with the prosecutor's investigator, who was seated at the state's table.

{¶ 38} Appellant used a peremptory challenge to excuse Kimmel. Moore sat on the jury.

{¶ 39} We review a trial court's ruling on a motion to dismiss a juror for cause for abuse of discretion. *State v. Gleason* (1989), 65 Ohio App.3d 206, 209, 583 N.E.2d 975. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 40} A juror may be challenged for cause because "the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state." Crim.R. 24(C). However, "no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict

according to the law and the evidence submitted to the jury at the trial." Crim.R. 24(C).

{¶ 41} Appellant asked the court to remove Kimmel for cause, stating that she had indicated that she would have a hard time deciding this case. The trial court stated that it did not recollect Kimmel making such a statement and overruled appellant's challenge. Appellant did not assert, as he does in his brief, that the reason he wished to remove her was because she knew the prosecutor's investigator. However, Kimmel unequivocally stated that the fact that she knew the investigator would not interfere at all with her deliberations in this case.

{¶ 42} Appellant also asked the court to remove Moore for cause. The court overruled this challenge. Certain portions of the transcript dealing with Moore are "inaudible," including counsel's explanation of why he wanted Moore removed for cause. But it is clear from Moore's statements that he was adamantly opposed to drugs.

{¶ 43} Moore made statements that he was "deadset against drugs," that he did not like anyone associated with drugs, and "[d]opers, I just don't like them." He also stated that the fact that appellant was involved with drugs would be "in the back of [his] mind." But when the court asked him whether he would be able to put the drug issue aside and concentrate on the charge, he stated, "I'll give it a shot." And when the prosecutor asked Moore whether he would be able to sort through the facts and make a determination based on the court's instructions despite his feelings about the drug lifestyle, Moore responded, "Yes." And upon appellant's counsel's questioning, Moore again stated that he would "go along with the evidence" regardless of the fact that appellant used drugs.

{¶ 44} The trial court did not abuse its discretion in overruling appellant's challenges for cause for Kimmel and Moore. Both jurors indicated through their answers that they could be fair, impartial jurors and decide the case on the evidence. Kimmel stated that the fact that she knew the prosecutor's investigator would not affect her deliberations in this case. And Moore stated that he could put his feelings about drugs aside and decide this case on the evidence presented. There was no indication to the contrary. It was within the court's discretion to take both jurors' words that they could act fairly and decide this case based on the evidence without letting personal matters interfere.

{¶ 45} Accordingly, appellant's seventh assignment of error is without merit.

{¶ 46} Appellant's eighth assignment of error states:

{¶ 47} "Appellant's right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments were violated when the trial court ruled that

the victim's letters were not sufficiently authenticated for use in questioning witnesses or admission into evidence."

{¶ 48} During trial, appellant wished to cross examine Foreman's mother, Kim Koerber, with numerous letters that he alleged that Foreman had written while she was incarcerated several months before her murder. The letters contained statements such as: Foreman was engaged in drug sales; "Al" and "Loretta" said that Foreman wore a wire on her drug supplier "Pike"; Pike cut her off and she was so angry that she wanted to shoot up his car; and Foreman wanted to kill "Holly" for her relationship with Al. The trial court questioned Koerber about whether she could authenticate the letters as being written by Foreman. Of the 17 letters, Koerber was able to identify only two of the letters as likely containing Foreman's handwriting. The trial court sustained the state's objections to the letters on the basis that they were unauthenticated.

{¶ 49} Appellant argues that he wanted to use these letters to demonstrate that Foreman had dangerous enemies who may have had a motive to kill her. He asserts that Foreman's mother was able to identify some of the letters. He contends that the state turned these letters over to him from Foreman's county jail records and that they were signed "Emily."

{¶ 50} A trial court has broad discretion in determining whether to admit or exclude evidence, and its decision will not be reversed absent an abuse of discretion. *State v. Mays* (1996), 108 Ohio App.3d 598, 617, 671 N.E.2d 553.

{¶ 51} "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). A nonexpert may give an opinion as to the genuineness of handwriting based on familiarity not acquired for purposes of the litigation in order to authenticate the handwriting. Evid.R. 901(B)(2).

{¶ 52} Here Koerber testified that she was familiar with Foreman's handwriting. She stated that she would "possibly" recognize Foreman's handwriting if she saw it. Thus, Koerber could give her opinion as to the genuineness of the handwriting in the letters.

{¶ 53} For the majority of the letters, Koerber could not state that the handwriting belonged to Foreman. In fact, at one point she stated that "all the handwriting [in the different letters] seems so different." Thus, for those letters whose handwriting Koerber could not identify at all (exhibits A through C, E, and H through R), there is no question that the court acted within its discretion in not admitting them.

{¶ 54} And Koerber's identification of the handwriting in the remaining two letters (exhibits F and G) was not absolute. As to exhibit F, the court asked

Koerber whether she could identify the writing. Koerber stated, "I can't be positive." The court then asked whether it appeared to be Foreman's writing, to which Koerber responded, "Yes." And as to exhibit G, Koerber stated, "It looks to be her handwriting." Notably, Koerber never stated that she was sure that either letter contained Foreman's handwriting. And Koerber stated that she had never seen these letters before. Thus, they were not written to her. These things, coupled with the facts that Koerber previously testified that she would only "possibly" be able to recognize Foreman's handwriting and that she stated that the writing in all of the letters seemed so different, are enough to support the court's determination to exclude exhibits F and G as unauthenticated.

{¶ 55} In sum, the trial court did not act unreasonably, arbitrarily, or unconscionably in excluding the letters. Accordingly, appellant's eighth assignment of error is without merit.

{¶ 56} Appellant's ninth assignment of error states:

{¶ 57} "Appellant's right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments were violated when the transcript of the police interview of Mr. Irwin's mother was mistakenly submitted to the jury although not offered or admitted into evidence."

{¶ 58} The day after the murder, police interviewed appellant's mother, Cheryl Carpenter, and recorded an interview. In the interview, Carpenter discussed appellant's heroin addiction, her recent struggles with him, and the fact that she had filed a criminal-trespassing complaint against him. During Carpenter's testimony at trial, the prosecutor used the transcript of this interview to refresh Carpenter's recollection, but noted that the state was not offering it as an exhibit. Carpenter read the statement only to herself. She did not read any part of it to the jury.

{¶ 59} Appellant contends that despite not being offered into evidence, the transcript of Carpenter's interview went to the jury with the other exhibits. Appellant argues that the transcript contained prejudicial information that was not otherwise brought out at trial. He points out that at the time of the interview, Carpenter was under the assumption that he had committed the murder. He also points out that she referred to his prior jail sentence, prior incidents of theft and dishonesty, his history of drug abuse, the fact that she felt responsible for Foreman's death because she could not stop him from using drugs, and the fact that she believed appellant committed the murder and had no remorse. And appellant notes that there were numerous handwritten notes in the transcript tending to indicate his guilt. Appellant argues that because this un-admitted evidence weighed so heavily against him, we must assume that the jury was prejudiced by it.

{¶ 60} It is not entirely clear why appellant makes the assumption that the transcript of Carpenter's police interview went to the jury. The interview was marked as State's Exhibit 131. But the prosecutor clearly stated, "I'm only marking it because it's going to need to be part of the record and I'm not—we're not going to offer it as an exhibit." Appellant can point to no portion of the record where the court actually admits the transcript into evidence. In fact, he admits that the transcript was never admitted.

{¶ 61} We can only speculate that the reason appellant assumes the transcript was sent to the jury, even though it was never admitted, is because it is included with the other state's exhibits attached to the trial transcript. A separate manila folder attached to the trial transcript is labeled "EXHIBITS NOT ADMITTED, DEFENDANT'S EXHIBITS, A, B, & C, E THROUGH R, DEFENDANT'S EXHIBIT D, ADMITTED—SAME AT [sic] STATE'S # 6."

{¶ 62} Perhaps the reason appellant assumes that the interview was given to the jury was because it was not contained in the folder labeled "exhibits not admitted." However, it appears that this folder was merely for defense exhibits not admitted, namely the letters. The only exhibits in this folder were the letters that appellant's counsel sought to admit, which the trial court did not allow.

{¶ 63} In addition to the transcript that appellant takes issue with, two other state's exhibits were not admitted, yet they remained part of the record. State's exhibits 7 and 30 were both offered but not admitted. The court noted, however, that even though they were not admitted, they would remain part of the official record. These exhibits, like the transcript, are marked and attached as part of the record with the other state's exhibits that were admitted. In fact, it seems that it may be the general practice that even when exhibits are not admitted into evidence and given to the jury, they remain part of the record.

{¶ 64} Appellant is asking this court to presume that an irregularity occurred here, without any proof of such an irregularity. If an appellant cannot demonstrate the claimed error, the appellate court is to presume the regularity of the trial court proceedings. *State v. Moore*, 11th Dist. No. 2007–L–196, 2008-Ohio-5941, 2008 WL 4901727, at ¶ 30. Because appellant cannot prove that the jury saw the transcript of Carpenter's interview, we cannot find error here. However, we should note that we are troubled by the apparent practice of attaching un-admitted exhibits along with the admitted exhibits to the trial transcript. The better practice would be to keep all un-admitted exhibits in a separate folder or location so that no confusion arises on this issue.

{¶ 65} Accordingly, appellant's ninth assignment of error is without merit.

{¶ 66} Appellant's fourth assignment of error states:

{¶ 67} "Appellant was denied his right to due process of law when he was not permitted to be present at the first day of the hearing of his motion for new trial."

{¶ 68} On the first day of the new-trial hearing, the court asked appellant's counsel whether he had arranged for appellant to be there. Appellant's counsel informed the court that he had expected that appellant would be brought back from prison but that it was his fault that appellant was not there. The court asked counsel whether he intended to proceed without appellant, to which counsel responded, "Yes." In its subsequent judgment entry, the court found that appellant's counsel "indicated to the court that he had not made arrangements to have his client returned from the institution for the proceeding. Therefore, Mr. Kafantaris waived the presence of his client."

{¶ 69} Appellant argues that the trial court violated his due-process rights by conducting a substantial portion of the new trial hearing without him.

{¶ 70} Crim.R. 43(A)(1) provides that a criminal defendant has a right to be present at all critical stages of his trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence.

{¶ 71} Crim.R. 43 does not provide that a defendant has a right to be present at a motion-for-new-trial hearing. Moreover, courts have held that a defendant does not have a right to be present at a hearing on his motion for new trial. *State v. Prichard* (Nov. 26, 1999), 1st Dist. No. C–990148, 1999 WL 1100139; *State v. Padavick* (Feb. 18, 1988), 8th Dist. No. 53343, 1988 WL 18656; *State v. South* (Nov. 5, 1987), 4th Dist. No. 446, 1987 WL 19694. Thus, appellant had no right to be present at his new-trial-motion hearing.

{¶ 72} Accordingly, appellant's fourth assignment of error is without merit.

{¶ 73} Appellant's fifth assignment of error states:

{¶ 74} "Appellant's rights to due process and to confront the witnesses against him, guaranteed by the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court refused to grant his attorney permission to question hostile witnesses with leading questions."

{¶ 75} During the motion-for-new-trial hearing, appellant's counsel attempted to use leading questions when questioning his witnesses. The prosecutor repeatedly objected, and the trial court sustained the objections. Appellant's counsel sought permission to treat Todd, the man who had allegedly confessed to Foreman's murder, as a hostile witness. The court refused permission, agreeing with the prosecutor that because appellant had subpoenaed Todd, his counsel had to ask him questions as if on direct examination.

{¶ 76} Appellant argues that the court should have permitted him to treat Todd as a hostile witness since appellant was seeking exoneration based on evidence that Todd was the true murderer. He likewise asserts that the court should have permitted him to treat Patricia Karns and Chief Burgess as hostile witnesses, so that he could ask them leading questions. Chief Burgess, appellant states, was the head of the investigation against him and was, therefore, the state's witness. As to Karns, appellant argues that his counsel was surprised by her testimony when she completely changed what she had said in a statement to police.

{¶ 77} During the hearing, appellant's counsel asked the court to have Todd and Chief Burgess declared hostile witnesses, so that he could ask them leading questions. The court denied these requests. Thus, the issues of whether the trial court should have declared Todd and Chief Burgess hostile witnesses are properly before us for review.

{¶ 78} But appellant's counsel never asked the court to declare Karns a hostile witness. Counsel asked many leading questions of her. To some of these leading questions, the trial court sustained the state's objections. However, since appellant never asked the court to declare Karns a hostile witness, he did not preserve this issue for appeal.

{¶ 79} It is within the trial court's discretion to allow or refuse leading questions on direct examination. *State v. Jackson* (2001), 92 Ohio St.3d 436, 449, 751 N.E.2d 946; *Ramage v. Cent. Ohio Emergency Serv. Inc.* (1992), 64 Ohio St.3d 97, 111, 592 N.E.2d 828.

{¶ 80} Evid.R. 611(C) provides, "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Generally, a party must show that a witness is either hostile or identified with the adverse party in order to permit leading questions on direct examination. *State v. Benson*, 11th Dist. No. 2001–P–0086, 2002-Ohio-6942, 2002 WL 31813024, at ¶ 25.

{¶ 81} "Traditionally, a 'hostile witness' is one who surprises the calling party at trial by turning against him while testifying. The traditional 'hostile witness' is addressed under Evid.R. 607. An 'adverse witness' is one who identifies with the opposing party because of a relationship or a common interest in the outcome of the litigation. Many times, the terms 'hostile' and 'adverse' are used interchangeably without drawing a clear distinction between the meaning of the terms." *State v. Darkenwald*, 8th Dist. No. 83440, 2004-Ohio-2693, 2004 WL 1171876, at ¶ 15.

{¶ 82} In this case, Todd did not testify in any proceeding other than the new-trial-motion hearing. Thus, he did not change his testimony. Additionally, his testimony was no surprise to appellant. Appellant was aware from Todd's polygraph test that Todd denied ever having confessed to the murder and denied having anything to do with the murder. Todd never turned against appellant while testifying. He gave the testimony appellant expected from him. This testimony just happened to be contrary to appellant's allegations in this case. Thus, Todd was not a "hostile" witness as appellant contends.

{¶ 83} But Todd may have been an adverse witness. In a criminal case, the state is the adverse party against the defendant. *Benson,* 2002-Ohio-6942, 2002 WL 31813024, at ¶ 24. Todd was not a party with the state. However, he may have shared a common interest in the outcome of the proceeding with the state. The state's interest at the new-trial hearing was to have the court overrule appellant's motion for a new trial so that appellant's conviction would stand. In order to do this, the state wanted the court to believe Todd's statement that he did not confess to Foreman's murder. Todd's interest was to clear his name. Thus, Todd's interest was somewhat similar, although not identical, to that of the state.

{¶ 84} If Todd was an adverse witness because his interests were aligned with the state's interests, then the trial court should have allowed appellant to ask him leading questions as if on cross examination. However, if such an error exists, it was harmless.

{¶ 85} First, even though the trial court denied counsel's request to treat Todd as a hostile witness, counsel nonetheless examined Todd using countless leading questions.

{¶ 86} Second, counsel questioned Todd for an extended period of time. During this questioning, counsel asked Todd the most important questions regarding whether he had ever confessed to Beaver. For instance, counsel asked Todd whether he had ever told Beaver that he stabbed Foreman and whether he had ever told Beaver that he took Foreman's dope. Whether counsel asked these questions in the form of nonleading or leading questions would not have made a difference in Todd's answers. Todd unequivocally testified that he had never made any such confession.

{¶ 87} Third, the motion for a new trial was heard by a judge, not a jury. Presumably, a judge would be less swayed by the effect of leading questions than would a jury.

{¶ 88} For these reasons, even if the court erred in not allowing appellant's counsel to ask Todd leading questions, any such error was harmless.

{¶ 89} As to Chief Burgess, he too was not a hostile witness. He did not give surprising testimony, nor did he turn against appellant during his testimony. Chief Burgess was likely an adverse witness, however. Chief Burgess was clearly aligned with the state, since he was the chief investigator for this case. Since Chief Burgess was an adverse witness, the court should have allowed counsel to ask him leading questions.

{¶ 90} But as with Todd, any error in not declaring Chief Burgess an adverse witness was harmless. Counsel sought to use leading questions when questioning Chief Burgess about a statement he took from Karns. But all counsel was attempting to do was to read Karns's statement, which contradicted the testimony she gave at the hearing. In actuality, counsel was attempting to impeach Karns by means of the statement that Chief Burgess had taken from her. Counsel admitted as much.

{¶ 91} Given counsel's argument on the issue, the court stated that it would read and admit into evidence the entire statement that Karns gave to Chief Burgess and consider it in weighing Karns's testimony. Consequently, the end result was the same as if the court had permitted counsel to read Karns's statement into the record by way of leading questions to Chief Burgess. Therefore, any error in failing to allow appellant's counsel to ask Chief Burgess leading questions was harmless.

{¶ 92} Accordingly, appellant's fifth assignment of error is without merit.

{¶ 93} Appellant's tenth assignment of error states:

{¶ 94} "Appellant's right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments were violated when the trial court exhibited an unfair bias against him in manner and rulings both at trial and at the hearing on the motion for new trial."

{¶ 95} Appellant argues here that the trial court was biased against him. He points to the court's limitation of voir dire, asserts that the court sustained nearly every objection made by the prosecutor and overruled nearly every objection he made, points out that the court threatened his counsel with contempt several times and eventually found him in contempt twice, and notes that the trial court would not allow him any continuances.

{¶ 96} As discussed above, the trial court's limitation of voir dire was reasonable. Furthermore, as will be discussed later, the denial of the requested continuances was also reasonable in light of the circumstances.

{¶ 97} As to the sustaining of the prosecutor's objections and the contempt warnings/findings, these rulings and warnings do not reflect a bias against appellant. Instead, they reflect that appellant's counsel was acting in a manner

that can be described as oblivious to the trial court's admonitions and the rules of evidence, in addition to raising irrelevant issues and proceeding in a painstakingly slow manner throughout the trial.

{¶ 98} It is impossible to completely portray the manner in which counsel conducted himself throughout this five-day trial and two-day motion hearing. However, some examples are illustrative.

{¶ 99} For instance, while cross-examining the East Liverpool dispatcher, counsel asked the following question:

{¶ 100} "You got a call to an ambulance. They don't know why they're being called. Okay? You can't send anybody over there because your officers are serving a warrant. Okay? Apparently Tri–County didn't call the sheriff's up to find out; they called you. Why didn't you, yourself, call the county and say, 'Why is this ambulance over there? Why is this ambulance being called?'"

{¶ 101} The dispatcher attempted to answer at this point, but counsel interrupted and continued, "You didn't think of it? Or it wasn't your job? Your job is to write things down. You know, people's life [sic] depends on this."

{¶ 102} And when questioning Officer Hedrick, appellant began his question as follows:

{¶ 103} "Now, you know, I had a case about 25 years ago. The guy had—was handed Quaaludes. Like in his pocket. And he was arrested. And they came back to collect the Quaaludes or the money and he had neither. But the police * * *."

{¶ 104} And when questioning the BCI investigator, counsel began his question with another speech:

{¶ 105} "Now, I knew somebody who was selling a car. He put it on the Internet, under E-bay? And I happened to know that car. Had a little picture of that car. And I didn't see any dents on it. So I say, 'Well, where are the dents?'"

{¶ 106} Later in questioning the same witness, counsel stated, "Okay. You know, as cases go, Mr. Carlini, things look kind of thin here."

{¶ 107} When questioning Chief Burgess, counsel began another speech, "That's nice and good, but you see, somehow—if I'm going to call the prosecutor and a BCI unit, I got to get my bearings. I got to go in. I got to look around. I got to see what's going on. I got to talk to somebody, maybe."

{¶ 108} In fact, counsel frequently seemed to think aloud before actually posing a question to the witnesses. Later, while counsel was questioning Chief Burgess, the following colloquy occurred:

{¶ 109} "Q. [by appellant's counsel] All right. Okay. I'm trying to figure things out. So you walk into the house. There's a dead woman over there. Or dying. Bleeding. Andy's in the car.

{¶ 110} "MR. HERRON [the prosecutor]: Your Honor, does Mr. Kafantaris have a question, please.

{¶ 111} "MR. GEORGE KAFANTARIS: I'm kind of thinking.

{¶ 112} "THE COURT: If you're going to think, think silently. And then ask a question, sir, please."

{¶ 113} And later, counsel continued:

{¶ 114} "Q. You're a little mistaken?

{¶ 115} "A. Yes, sir.

{¶ 116} "Q. Any other mistakes?

{¶ 117} "A. (No audible response).

{¶ 118} "Q. No way.

{¶ 119} "A. I'm human, sir.

{¶ 120} "Q. Right. Human. I'm human. A human makes mistakes.

{¶ 121} "THE COURT: Is that a question, sir?

{¶ 122} "MR. GEORGE KAFANTARIS: He say, 'I'm human.' I say, 'I'm human, too.' I make more [mistakes] than anybody else, you know.

{¶ 123} "MR. HERRON: Is there a question, Your Honor?

{¶ 124} "THE COURT: What's the question, Mr. Kafantaris, please.

{¶ 125} "MR. GEORGE KAFANTARIS: I make mistakes.

{¶ 126} "THE COURT: Now, wait a minute. The objection is sustained. The jury is instructed to disregard the commentary. We need a question.

{¶ 127} "MR. GEORGE KAFANTARIS: Okay. We need a question."

{¶ 128} Additionally, while questioning Foreman's mother about Foreman's drug use, counsel began another commentary:

{¶ 129} "Q. You know, sometimes things happen under your nose, you don't know about them.

{¶ 130} "MR. HERRON: Objection. Is that a question?

{¶ 131} "THE COURT: Sustained. Stricken.

{¶ 132} "Q. I'm just talking to myself here.

{¶ 133} "THE COURT: Mr. Kafantaris—

{¶ 134} "Q. And it's painful for me. Don't think that it ain't.

{¶ 135} "THE COURT: Counsel. Counsel, I'm warning you. I want questions, please. I've tried to be patient. All right?"

{¶ 136} When he began questioning a deputy coroner from Cuyahoga County, counsel started off by stating, "You know, we got a funeral home? We do. It might surprise you, but we do." Later, the coroner replied to a question by stating that it was up to the jury to decide who committed the murder. Counsel then stated, "That's very fair. That's the grandest, the fairest thing I heard here today."

{¶ 137} Counsel also made personal references about the principles in this case while questioning the witnesses. For instance, when questioning the DNA analyst counsel referred to Foreman, saying, "Poor Emily * * * I feel bad for her." And when questioning Foreman's mother about the alley access behind her house, he stated, out of the blue, "I love my kid. If he was standing here where Andy is, I'd love him no more, no less." And counsel commented to the coroner, "[Y]ou remind me of my dad."

{¶ 138} Counsel even went so far as to make the following comment to the judge as the parties were discussing the logistics of the jury, "There was a nice picture of you in the paper, Judge. You looked very calm. * * * Very scholarly."

{¶ 139} These are the types of questions and comments to which the court sustained the state's objections. These are also the types of comments and questions that resulted in the court's finding that counsel was in contempt. Counsel seemed to repeatedly disregard the court's instructions and admonitions to stop making speeches, stop editorializing, and simply ask relevant questions of the witnesses. Since counsel refused to heed the court's warnings, we cannot view the adverse rulings against appellant as demonstrating a bias toward appellant or his counsel, but instead as a means of the court exercising control over the trial.

{¶ 140} Additionally, the court did periodically sustain appellant's objections and grant his requests.

{¶ 141} Accordingly, appellant's tenth assignment of error is without merit.

{¶ 142} Appellant's eleventh assignment of error states:

{¶ 143} "The appellant was denied his constitutional right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments because of prosecutorial misconduct at trial, during closing argument, and after appellant's conviction."

{¶ 144} Here, appellant argues that the prosecutor engaged in continuing misconduct. He acknowledges that he did not object to these alleged instances of misconduct at trial. But he argues that his trial counsel was ineffective for failing to object to these instances and, therefore, these errors are preserved for purposes of this appeal.

{¶ 145} The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136. In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected the appellant's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶ 61, quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 121.

{¶ 146} A failure to object to alleged prosecutorial misconduct generally waives all but plain error. *Hanna* at ¶ 77; *LaMar* at ¶ 126. But a defendant's claim that he was denied effective assistance of counsel eliminates the requirement that an objection be made in order to preserve an error for appeal. *State v. Carpenter* (1996), 116 Ohio App.3d 615, 621, 688 N.E.2d 1090.

{¶ 147} We will review each of appellant's alleged instances of misconduct.

{¶ 148} First, appellant asserts that the prosecutor feigned ignorance of the origin of Foreman's letters when the state was the party who turned the letters over to appellant.

{¶ 149} Appellant makes several allegations here that are unsubstantiated by the record. Appellant claims that these letters had been in Foreman's jail records and that the prosecutor knew of the letters' origin. However, appellant points to no support in the record for these claims. He makes this assumption because the state showed appellant the letters during discovery. Simply because the letters were in the state's possession does not mean that the state knew the origin of the letters or who authored them. Thus, there was no prosecutorial misconduct concerning the letters.

{¶ 150} Second, appellant contends that the prosecutor acted unethically by arguing against a continuance so that appellant could present newly discovered evidence by way of Beaver's testimony that someone else had confessed to the

crime and then later, at the new-trial hearing, arguing that the motion should be denied because Beaver was available to testify at the trial.

{¶ 151} When appellant requested a continuance on the last day of trial so that he could locate Beaver and bring him to testify as to Todd's alleged confession, the prosecutor objected. The prosecutor argued that Todd was on appellant's witness list. He further argued that the case should go forward because the jury was already there and had heard testimony that appellant had admitted to the crime. The prosecutor also indicated that regardless of the outcome of the case, it would follow up and investigate Beaver's alleged statements. At the motion-for-new-trial hearing, Beaver testified that he was available to testify on the fifth day of trial and would have been willing to do so if asked.

{¶ 152} The prosecutor did not know until Beaver testified at the new-trial hearing that he was willing and able to testify on the fifth day of trial. Because the prosecutor could not have known this at the time he argued against the continuance, appellant cannot say that it was misconduct for the prosecutor to argue against the continuance.

{¶ 153} Third, appellant asserts that the prosecutor waited to file its reply to appellant's motion for a new trial until the afternoon before the hearing and included polygraph test results even though they were inadmissible without the stipulation of the parties.

{¶ 154} We do not condone the prosecutor's backhanded attempt to introduce the polygraph results, which we will discuss in greater detail below. However, we cannot conclude that it rises to the level of misconduct.

{¶ 155} Fourth, appellant argues that the prosecutor turned over the police call log dealing with "Linville" in an untimely fashion.

{¶ 156} Here appellant is referring to a call made to police by a man named "Michael Linville." Linville claimed to have information concerning Foreman's murder. Linville did not contact police, however, until May 19, 2007, when the court was already engaged in the motion-for-new-trial hearing. Chief Burgess testified that he asked Linville to come in and give a statement three times, but Linville never showed up. Chief Burgess was unsure whether Linville was a real person or an imposter.

{¶ 157} The police received the Linville call on May 19, a Saturday. Appellant's counsel stated at the May 22 hearing date that the prosecutor just gave him a copy of the call log that day. May 22 was a Tuesday. The prosecutor stated that he faxed appellant's counsel a copy on the previous day, which would have been the first business day after the police received the call. However, appellant's counsel stated that he could not receive a fax that Monday because of some type of "changeover" at his office. Consequently, the prosecutor could not have

engaged in misconduct because he tried to give appellant's counsel a copy of the call log on the first business day after police received it.

{¶ 158} Fifth, appellant contends that the prosecutor went beyond the evidence in giving a dramatic narrative of why appellant must have killed Foreman.

{¶ 159} In his closing argument, the prosecutor stated in part: "This Defendant was desperate and was in a desperate rage. He needed money. He needed a driver's license. He wanted heroin." The prosecutor then later stated:

{¶ 160} "The Defendant * * * in a fit of rage, for some reason or other, he's angry that he (sic) won't give him her driver's license—his driver's license. He's angry that she won't take the check for dope. He's angry she won't give him more dope. And he's not taking no for an answer. And he grabs her around the throat. With his other hand, he's got that knife. 'Give it to me. Give it to me.' You heard how he treated his mother. 'Give it to me,' he's saying. 'Give it to me.' She's not giving it up. And he puts that knife deeper and harder on her. 'Give it to me.' He's not taking no for an answer, this guy."

{¶ 161} Part of the prosecutor's closing argument went beyond the scope of the evidence. There was evidence that appellant was angry, that he treated his mother poorly that day, that he needed to get his driver's license back from Foreman, that he was angry Foreman would not accept a check, and that he stabbed Foreman. But there was no evidence that appellant said, "Give it to me" over and over while he stabbed Foreman as the prosecutor suggested.

{¶ 162} Parties are generally afforded wide latitude in closing arguments. *State v. Spivey* (Jan. 13, 1997), 7th Dist. No. 89–CA–172, 1997 WL 16196; *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. When reviewing whether a prosecutor's remarks during closing arguments were prejudicial, we must view the closing argument in its entirety. *State v. Treesh* (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749; *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 407 N.E.2d 1268.

{¶ 163} In reviewing the prosecution's entire closing argument, we cannot conclude that these isolated improper comments were prejudicial. Two prosecutors prosecuted this case. One gave the initial part of the closing argument, and the other gave the rebuttal portion. The first prosecutor took a few minutes to go over the elements of the crime, the jury's duty, and role of the people involved in the process. He then went through the evidence, summarizing most of the witnesses' testimony. The second prosecutor spent most of his time attacking appellant's "conspiracy theory" of the case and rebutting appellant's counsel's comments on the evidence.

{¶ 164} This was a five-day trial with numerous witnesses, over 1,100 pages of testimony, and over 100 exhibits. It is unlikely that the improper comments in an otherwise proper closing argument prejudiced appellant to the point that it altered the outcome of his trial. Instead, as we will next discuss, appellant's counsel's ineffectiveness was what prejudiced his right to a fair trial. In fact, this improper comment by the prosecutor during closing argument is but one example of the ineffective assistance of appellant's counsel. Counsel should have objected to the prosecutor's commentary regarding the inflammatory statements that were not in evidence.

{¶ 165} Finally, appellant argues that the prosecutor withheld evidence that, according to Chief Burgess, "pointed in other directions."

{¶ 166} On cross-examination, appellant's counsel asked Chief Burgess whether, during the course of his investigation, he looked for any other suspects. Chief Burgess testified that throughout the investigation there were other suspects. He then stated, "There was other information that would have came in that pointed at other directions, but they ended up nowhere. Dead ends."

{¶ 167} Appellant claims that the state failed to turn over this "information that pointed in other directions." Appellant fails to consider that Chief Burgess testified that he investigated other suspects and all of the information and found that it all resulted in "dead ends." Exactly what information or who Chief Burgess investigated is not in the record. Additionally, appellant makes no claims as to what this evidence might be or how it may have helped him. Without more to go on, it is difficult to discern whether or how appellant was prejudiced in this regard.

{¶ 168} Accordingly, appellant's 11th assignment of error is without merit.

{¶ 169} Appellant's second assignment of error states:

{¶ 170} "Appellant's right to due process guaranteed by the Fifth and Fourteenth Amendments was violated when the trial court denied appellant's motion for a new trial based on newly discovered evidence."

{¶ 171} Appellant claims that the trial court should have granted him a new trial based on the newly discovered evidence he presented that Greg Todd had confessed to the murder. He further argues that the trial court abused its discretion by considering the results of polygraph tests that the state submitted along with its response to appellant's motion for a new trial. He asserts that he never stipulated to these results and that they were inherently unreliable. Appellant argues that the court's job was to judge whether the newly discovered evidence demonstrated a strong probability that it would change the result of the

trial. Instead, appellant claims that the court weighed the credibility of the witnesses using the inadmissible polygraph-test results.

{¶ 172} We review a trial court's decision to grant or deny a Crim.R. 33 motion for a new trial for abuse of discretion. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 76, 564 N.E.2d 54.

{¶ 173} A new trial may be granted on the defendant's motion, "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." Crim.R. 33(A)(6). In order to grant a new trial based on newly discovered evidence, it must be shown that the new evidence, "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus.

{¶ 174} The evidence at the new trial hearing was as follows.

{¶ 175} Tommy Shields was in jail with appellant and Todd. He testified that he saw appellant and Todd in jail and that he told his ex-girlfriend, Julie Conyer, that he saw them. He also stated that he told Conyer that he saw Todd leaving the jail chapel crying. Shields stated that he never talked to appellant or Todd.

{¶ 176} Conyer, however, testified that after Shields was released from jail, he told her otherwise. According to Conyer, Shields stated that he saw appellant and Todd leaving the jail chapel together, crying. She stated that Shields told her that he asked Todd what was wrong and Todd told him, "I can't believe he's taking the fall for me. I can't believe he's doing this man." Conyer further stated that Shields told her that Todd told him that both he and appellant were at Foreman's house on the day of the murder. According to Conyer, Todd also told Shields he was covered in blood walking down the street and the "East Liverpool cops were so f-ing stupid, because they drove right past him."

{¶ 177} Shelly Short, Conyer's friend, testified that Conyer told her about Shields's alleged statement.

{¶ 178} Jason Beaver was the main witness to testify for appellant. According to Beaver, Todd came to his apartment sometime after the murder, possibly in late August, and brought 35–50 stamps of heroin. Beaver stated that he allowed Todd to "shoot up" in his apartment in exchange for five stamps of heroin, which he then traded for cocaine.

{¶ 179} According to Beaver, after Todd used his heroin, he confessed to Foreman's murder. Todd allegedly told Beaver that he went with appellant to Foreman's house on the day of the murder to rob Foreman of her heroin. Beaver stated that Todd told him that a struggle ensued when Foreman began swinging a knife at him. Beaver stated that Todd stated that appellant grabbed Foreman's arm while he got the drugs out of her purse. Beaver testified that Todd stated that he took the knife from Foreman and stabbed her. At the time of this conversation, both Beaver and Todd were on drugs.

{¶ 180} Beaver additionally stated that Todd told him that after stabbing Foreman he left her house on foot. Todd told Beaver, "The dumbass police drove right by."

{¶ 181} Beaver testified that at first he did not care about Todd's confession because he was on drugs. However, he stated that once he got sober, Todd's confession began to bother him. Beaver stated that the reason he waited almost five months to tell anyone about Todd's confession was that he was going through withdrawal. At the time, Beaver was living with Patricia Karns and he told her what he knew. Beaver testified that he finally called appellant's brother on the Friday of trial and told him what Todd had said.

{¶ 182} Finally, Beaver testified that he was available and willing to testify on the Saturday of trial.

{¶ 183} Next, appellant called Todd to testify. Todd testified that he learned of the allegation that he had made a confession in this case, so he went to the police chief to find out how to handle the situation. He asked whether he could take a polygraph test to clear his name. Todd stated that he gave fingerprint and DNA samples. Todd denied that he had ever confessed to Beaver or Shields.

{¶ 184} And appellant called Michael LoPresti, the polygraph examiner, to testify regarding the results of Beaver's and Todd's polygraph tests. The prosecutor had attached the polygraph results to its response to appellant's motion for a new trial. LoPresti testified that he concluded Beaver was not telling the truth when he stated that Todd told him he stabbed Foreman. He also testified that he concluded Todd was being truthful when he stated he did not stab Foreman.

{¶ 185} Additionally, appellant called Patricia Karns. Beaver lived with Karns for a period of time. Karns testified that Beaver initially told her that he wanted to stop using drugs because appellant had killed Foreman. But she stated that Beaver later told her that Todd had confessed to him that he was the one who had killed Foreman. Karns further testified, however, that Beaver is a compulsive liar, she never knows when he is telling the truth, she does not believe anything he says, and she does not believe what he said about Todd's confession.

{¶ 186} Finally, appellant called Chief Burgess. Chief Burgess testified that Karns made a statement to him that Beaver told her Todd had confessed to Foreman's murder and that she believed him.

{¶ 187} Appellant called numerous other witnesses, none of whom testified as to any newly discovered evidence or corroborated or contradicted the key testimony of Beaver and Todd. These witnesses included the coroner, appellant's stepsister, appellant's stepmother, and appellant's mother.

{¶ 188} In its judgment entry denying appellant's motion, the trial court briefly summarized the testimony. It then stated that it was faced with weighing the witnesses' credibility. The court found that Todd's testimony was most reliable. It stated that Todd's testimony was "extensive and convincing." The court also stated that it considered the results of the polygraph tests indicating that Todd was telling the truth when he denied responsibility for Foreman's murder while indicating that Beaver was lying when he stated that Todd had admitted to the murder.

{¶ 189} In order to warrant a new trial, appellant had to demonstrate that the new evidence complied with the *Petro* requirements, 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus.

{¶ 190} First, the evidence had to disclose a strong probability that it would change the trial's outcome. If we consider Beaver's and Conyer's testimony, there is a strong possibility that it could change the outcome of appellant's trial. Both witnesses, independent of each other, testified that Todd confessed to the murder. Additionally, they both gave the same detail that Todd stated that he walked down the street after the murder and the police drove right by him. This corroborating detail makes their testimony even stronger.

{¶ 191} Beaver testified that Todd confessed to him, while Conyer testified that Todd confessed to Shields. However, Shields denied ever telling Conyer that Todd confessed. Additionally, we must consider that Todd testified that he had nothing to do with the murder and denied ever making confessions to the contrary. Nonetheless, given Conyer's and Beaver's testimony, there is a strong possibility that the evidence would change the trial's outcome. Their testimony might have been just enough to create a reasonable doubt as to appellant's guilt in the mind of at least one juror.

{¶ 192} Second and third, the evidence must have been discovered since the trial and could not have been discovered before trial with the exercise of due diligence. Appellant met these requirements. Beaver contacted appellant's family the evening before the last day of trial and told them of Todd's alleged confession. Appellant brought this information to the court's attention the next morning and asked for a continuance so that he could bring Beaver in to testify

about the confession. The court denied this motion and told appellant that if he was convicted, he could raise this issue in a new-trial motion. Thus, although this evidence was discovered in the 11th hour of trial, the trial court told appellant to raise it in a new-trial motion.

{¶ 193} The trial court found it significant that Todd had been on appellant's witness list, yet counsel never interviewed him. The court seemed to suggest that had counsel interviewed Todd, he would have known about the alleged confession in a more timely manner. But what the court seemed to ignore here is that even had counsel interviewed Todd prior to trial, it is highly improbable that Todd would have confessed to the murder.

{¶ 194} Fourth, Todd's alleged confession is material to appellant's defense.

{¶ 195} Fifth, Todd's alleged confession is not cumulative to former evidence because there was no such evidence at the trial.

{¶ 196} Sixth, Todd's alleged confession does not merely impeach or contradict the former evidence. The alleged confession would not impeach or contradict any other witness, as no one testified at all regarding Todd or the fact that someone else may have confessed.

{¶ 197} Whether the court should have granted appellant a new trial depends on whether the new evidence demonstrated a strong probability that it would change the trial's outcome. This is where appellant's other arguments come into play.

{¶ 198} Appellant asserts that the trial court should not have considered the results of Beaver's and Todd's polygraph tests because he never stipulated to the results. In Ohio, the results of polygraph examinations are generally not admissible unless both parties stipulate to admission. *State v. Jackson* (1991), 57 Ohio St.3d 29, 37, 565 N.E.2d 549.

{¶ 199} Appellant ignores the fact that he, not the state, called the polygraph examiner as a witness and questioned him about the results of the polygraph tests and how he reached his conclusions on the tests, thus placing the results into evidence. And appellant, not the state, moved to have the results of Todd's polygraph test admitted into evidence. While the state did solicit the polygraph tests and attach the results to its response to appellant's motion for a new trial, at that point the trial court had not given any indication as to whether it would consider the results in ruling on appellant's new-trial motion. Appellant additionally put the results of Todd's polygraph test into evidence in another way. Before calling the polygraph examiner, appellant called Todd to testify. While questioning Todd, counsel asked him how he found out that he had passed the

polygraph test. It was appellant who put the test results into evidence for the court to consider.

{¶ 200} This is yet another example of how appellant's counsel was ineffective. Given the fact that polygraph results are inadmissible absent stipulation by both parties, appellant's counsel should have objected to the state's attaching the polygraph results to its responsive motion. Counsel should have moved the trial court to ignore the polygraph results, given the fact that they weighed against his motion. Certainly, counsel should not have brought up the polygraph results at the motion hearing or moved for their admission.

{¶ 201} Appellant further contends that the trial court impermissibly weighed the witnesses' testimony instead of judging whether the newly discovered evidence would likely change the result of his trial. This court has previously held that the trial court has discretion to determine whether the confession of another person is credible and would change the outcome of the defendant's trial. *State v. Pasco* (Sept. 10, 1987), 7th Dist. Nos. 82–C–40 and 83–C–28, 1987 WL 16853. See also *State v. Perdue,* 7th Dist. No. 04–MA119, 2005-Ohio-2703, 2005 WL 1300782, at ¶ 19, citing *Pasco.* Therefore, the trial court acted within its discretion in weighing the witnesses' credibility.

{¶ 202} But there remains a strong possibility that the evidence of Todd's alleged confession might have changed the outcome of appellant's trial. There was no eyewitness that named appellant as the murderer. And while there was forensic evidence that placed appellant inside Foreman's house, there was no forensic evidence that directly linked appellant to the stabbing. Furthermore, appellant was the one who called 9–1–1 and the police department, not once but twice, to summon help for Foreman. He remained at Foreman's house waiting for help instead of fleeing. The strongest evidence that connected appellant to the murder was the testimony by the paramedic that appellant told him that "she" attacked him, so he stabbed her, and the knife was inside the house, and the testimony by Officer Hedrick who stated that appellant told him, "I came here to buy dope and she tried to stab me." If the jury was presented with evidence from two witnesses that Todd was with appellant at Foreman's house and that Todd confessed to the murder, it could raise a reasonable doubt in their minds as to appellant's guilt.

{¶ 203} Furthermore, the polygraph results should have never been before the trial court to consider. The court's decision was based in significant part on the polygraph results. Had the polygraph results not been in evidence, the court might not have determined that Todd's testimony was more credible than Beaver's testimony.

{¶ 204} The Ohio Supreme Court has held that a trial court does not abuse its discretion in denying a motion for a new trial if the newly discovered evidence,

forming the basis of the motion, fails to satisfy the *Petro* requirements, 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 85. Hence, if the newly discovered evidence does in fact satisfy the *Petro* requirements, then a trial court abuses its discretion in denying the motion. That is the case here. As discussed, the newly discovered evidence of Todd's confession satisfies all six of the *Petro* requirements. Therefore, the trial court abused its discretion in denying appellant's new-trial motion. Accordingly, appellant's second assignment of error has merit.

{¶ 205} We will now review the remainder of appellant's assignments of error under the umbrella of ineffective assistance of counsel and cumulative error.

{¶ 206} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. Id. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley* at paragraph three of the syllabus.

{¶ 207} Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289, 714 N.E.2d 905. In Ohio, a licensed attorney is presumed competent. Id.

{¶ 208} An appellate court may reverse a defendant's conviction based on the doctrine of cumulative error. Cumulative error occurs when errors deemed separately harmless deny the defendant a fair trial. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus.

{¶ 209} Appellant's twelfth assignment of error states:

{¶ 210} "The appellant was denied his right under the Sixth and Fourteenth Amendments to the effective assistance of counsel when defense counsel failed to protect his rights during trial."

{¶ 211} Appellant argues here that his trial counsel was ineffective and raises several instances of ineffectiveness.

{¶ 212} First, appellant asserts that his counsel did not interview any of the witnesses prior to trial, but merely created a witness list from a list appellant's mother gave him.

{¶ 213} The record reflects only one witness that appellant's counsel failed to interview. When the court questioned counsel about whether Todd was on his

witness list and why he was on the list, counsel responded, "It's a bunch of people that his mom gave him." Counsel stated that he was not able to locate Todd, so he never interviewed him. The court then pointed out that Todd was incarcerated at the same time as appellant. Had appellant's counsel interviewed Todd, the result of the trial would not have been different. Todd testified at the new-trial hearing, and his testimony would not have helped appellant's case. Thus, counsel's failure to interview Todd did not result in prejudice to appellant.

{¶ 214} Second, appellant asserts that counsel should have moved for a change of venue given the large amount of pretrial publicity this case had received.

{¶ 215} Again, the record does not reflect that a change of venue was necessary. The court did mention at least once that this was a high-profile case. However, there was no indication during voir dire that the jurors were adversely affected by any pretrial publicity or that they had any preconceived ideas regarding appellant's guilt or innocence. Counsel could have reasonably decided that no change of venue was necessary to ensure a fair trial. See *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 229.

{¶ 216} Third, appellant claims that during trial, his counsel was unprepared to question the witnesses and failed to object to the alleged prosecutorial misconduct.

{¶ 217} Counsel did fail to object to any possible instances of prosecutorial misconduct. As we already discussed, there was one occasion when the prosecutor made improper, inflammatory comments during closing arguments. Counsel should have raised an objection there.

{¶ 218} As to the questioning of witnesses, appellant has not asserted how the witnesses could have been handled more effectively or how the outcome of his trial would have been different. However, as was illustrated in appellant's seventh and tenth assignments of error, counsel frequently made speeches, editorialized, made improper comments, and lost his way both while conducting voir dire and in questioning witnesses. These missteps accumulated during trial. And with each inappropriate comment or instance of being unprepared, the trial court was forced to sustain the prosecutor's objections or to admonish appellant's counsel. As this pattern continued throughout the trial, the jury likely developed a dislike for appellant's counsel that it may have unintentionally held against, appellant, resulting in prejudice to him.

{¶ 219} Appellant's remaining assignments of error further encompass counsel's ineffectiveness. We will discuss them in that context.

{¶ 220} Appellant's first assignment of error states:

{¶ 221} "Appellant's right to due process guaranteed by the Fifth and Fourteenth Amendments was violated when the trial court denied appellant's request for a reasonable continuance of the trial based on newly discovered evidence."

{¶ 222} After the state rested on a Friday, the court ordered the parties and jurors to return on Saturday for the defense to begin its case. On Saturday morning, appellant's counsel appeared before the court and revealed the events that had allegedly transpired the previous evening. According to counsel, appellant's family received phone calls from Jason Beaver, who claimed that Greg Todd had confessed to the murder. Counsel requested a continuance so that he could bring Beaver in as a witness. He pointed out to the court that he could not subpoena Beaver because it was a Saturday and the clerk's office was closed. The trial court denied the requested continuance. It told appellant's counsel that if appellant was found guilty, he could file a motion for a new trial based on newly discovered evidence.

{¶ 223} Appellant argues that the trial court abused its discretion in denying his requested continuance. He asserts that he only needed a continuance long enough for his counsel to drive to Beaver's house and bring him in as a witness.

{¶ 224} We review a trial court's decision to grant or deny a continuance for abuse of discretion. *State v. Hook* (1986), 33 Ohio App.3d 101, 104, 514 N.E.2d 721.

{¶ 225} The trial court did not abuse its discretion in denying the continuance here. However, counsel's failure to ensure Beaver's appearance at trial contributed to counsel's ineffectiveness.

{¶ 226} First, appellant requested the continuance on the fifth day of trial, which the court held on a Saturday. By this time, the jury had already reported to court and was waiting to proceed. Thus, a continuance at this point would have been inconsiderate to and inconvenient for them.

{¶ 227} Second, as appellee pointed out, the timing of appellant's newly discovered evidence was highly suspicious. He requested a continuance due to an 11th hour phone call in which Beaver allegedly reported that Todd had confessed to the murder. Appellant had listed Todd as a witness on his witness list, but counsel never interviewed him. The trial court found this fact significant.

{¶ 228} Third, at this point in time, appellant was simply relying on the word of his mother and brother that Beaver made a call to them the previous night and reported the alleged confession. The court had nothing else to go on at this time and questioned whether "these people," Beaver and Todd, actually existed. This was not unreasonable at the time, given the timing of the call.

{¶ 229} Fourth, as the court stated, if the jury convicted appellant and appellant found out that there was some substance to the newly discovered evidence of the alleged confession, then he would have an appropriate remedy by way of a motion for a new trial.

{¶ 230} But as we stated above, although the court's decision to deny the continuance was not an abuse of discretion, counsel's failure to get Beaver to trial played a part in his ineffectiveness. At the new trial hearing, Beaver testified that he was available and willing to testify on the Saturday of trial. And Beaver stated that he talked with appellant's counsel that day and with appellant's father. In fact, Beaver stated that appellant's father picked him up that day so that he could make a written statement at the police station. Beaver stated that appellant's father then drove him to a pizza shop to meet appellant's counsel, where he made a tape-recorded statement. Thus, Beaver was available to testify, and appellant's counsel was well aware of this fact. There was no need to subpoena Beaver as appellant's counsel suggested to the trial court. Furthermore, counsel became aware on Friday night of Beaver's phone call and even called the trial judge's bailiff that night in an attempt to inform the judge of the latest development. Given the potentially exculpatory evidence Beaver possessed and given that appellant's counsel knew that Beaver was willing and available to testify, counsel was ineffective in failing to arrange for Beaver to get to the courthouse on Saturday morning.

{¶ 231} Thus, appellant's first assignment of error is without merit.

{¶ 232} Appellant's sixth assignment of error states:

{¶ 233} "Appellant's rights to due process and an impartial jury under the Fifth, Sixth and Fourteenth Amendments were violated when he was forced to wear leg irons that were visible to the jury during the course of his trial."

{¶ 234} Appellant contends that he was shackled during the entire trial and that the shackles were visible to the jury. Appellant contends that the record reflects that he wore ankle irons and was "handcuffed, hands and knees." Appellant argues that the trial court gave no justification for the shackling. Therefore, he contends that he was denied the right to be tried by an impartial jury.

{¶ 235} Shackling a defendant in plain view of the jury is inherently prejudicial. *Deck v. Missouri* (2005), 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953. In fact, "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." Id. at 635, 125 S.Ct. 2007, 161 L.Ed.2d 953.

{¶ 236} But the issue here is not whether shackling was prejudicial to appellant. Instead, the issue is whether appellant was actually shackled in view of the jury. The record reflects that he was not.

{¶ 237} Confusion stems from a hypothetical question posed to one of the potential jurors by appellant's counsel during voir dire:

{¶ 238} "Well, you're sitting over here, and you're looking at Andy, and you're wondering, like the rest of us folks here, you know, about some reason why he's here. He's the one sitting in that chair. Not somebody else. And His Honor would tell you, as he'll tell everybody else, that you're to presume that he's innocent. How do you feel presuming that somebody is innocent when, you know, 'Well, he's here, sitting in that chair, and he's got ankle irons on.' How do you feel presuming that?"

{¶ 239} The fact that the ankle iron comment is in quotes seems to reflect that this comment was made figuratively.

{¶ 240} Additionally, at the time when appellant was "handcuffed, hands and knees," which he refers to in support of his argument, the jury was not present.

{¶ 241} Furthermore, on the third day of trial before the jury returned to the courtroom, the prosecutor called the court's attention to an incident that occurred in the parking lot between appellant's family members and Foreman's family members. The prosecutor made a note of appellant's hostility. The prosecutor then stated, "And if I observe any further incident like I've seen here just at the break, I'm going to ask that he be shackled and handcuffed." The court then informed appellant's attorney that if any further incidents occurred, "I'm going to follow the prosecutor's recommendation." These comments indicate that appellant was neither handcuffed nor shackled in the jury's presence but that the court would do so if appellant's behavior warranted such action.

{¶ 242} Appellant can point to no evidence in the record that establishes his allegations. Because we are required to presume regularity in the trial court proceedings absent *evidence* to the contrary, we cannot decisively conclude that appellant was actually ever handcuffed or shackled in the jury's presence.

{¶ 243} But this is another instance when counsel was ineffective. As noted above, counsel did make a comment during voir dire that appellant was wearing ankle irons. And there seems to be some confusion as to whether appellant might have worn some sort of restraints in the jury's view. One of counsel's duties is to preserve the record for appeal. Appellant's counsel should have made a clear record as to the shackling issue, so that if appellant was ever shackled in the jury's view, this court could have thoroughly reviewed the issue.

{¶ 244} Accordingly, appellant's sixth assignment of error is without merit.

{¶ 245} Appellant's third assignment of error states:

{¶ 246} "Appellant's right to due process guaranteed by the Fifth and Fourteenth Amendments was violated when the trial court denied Mr. Irwin's motion for a continuance of the new trial motion hearing."

{¶ 247} On the morning of the second day of the new trial hearing, the prosecutor gave appellant's counsel a "call record" from the Liverpool Township Police Department. Appellant's counsel attempted to use this call record to question Chief Burgess. He wished to question Chief Burgess about a man named Mike Linville, who had allegedly called the police three days earlier regarding the Foreman murder. The caller gave his name, address, and phone number and was later reached by telephone by Officer Headley. The man reported that on the day of the murder, he was riding his bicycle past Foreman's house when he heard a blood-curdling scream. At the same time, he observed appellant sitting in a blue Ford Fairmont. He stated that he did not initially come forward because he had read that appellant confessed. However, upon learning that someone else may have confessed, he contacted police.

{¶ 248} The court did not permit appellant to question Chief Burgess about the call record. The court questioned Chief Burgess about whether Linville was a real person, since his only contact was by telephone. The court concluded that this evidence was irrelevant.

{¶ 249} Appellant's counsel asked the court for a continuance so that he could locate Linville and bring him in for questioning, but the court denied this request.

{¶ 250} Appellant argues that the court abused its discretion in disallowing a continuance so that he could locate Linville. He points out that the prosecutor did not turn over the call record until the morning of the second day of the new-trial hearing.

{¶ 251} As previously stated, we review a trial court's decision to grant or deny a continuance for abuse of discretion. *Hook,* 33 Ohio App.3d at 104, 514 N.E.2d 721.

{¶ 252} Here the trial court did not abuse its discretion in denying appellant's motion for a continuance. First, as appellee points out, appellant filed his new-trial motion based on the newly discovered evidence of Todd's alleged confession. The phone call to police by the person claiming to be Linville played no part in appellant's motion. Second, by the time appellant asked for a continuance, he had already presented 13 witnesses spanning a two-day hearing. Many of these witnesses provided no relevant testimony as to whether Todd had confessed to Foreman's murder. Third, the state did not wait until the morning of the second day of the new trial hearing to turn over the call record as appellant alleges. Appellant's counsel admitted that he could not receive the copy of the call record that the state faxed to his office because of a "changeover" with his fax machine.

Given these circumstances, the trial court acted reasonably in denying appellant's requested continuance.

{¶ 253} But yet again, the Linville call record raises questions about appellant's counsel's effectiveness. First, had appellant's counsel been available on the Monday following the Linville call, he would have received the call record from the prosecutor the day before the motion hearing instead of that morning. He could have then investigated the matter before the hearing resumed. Second, by the time counsel made his motion for the continuance, the trial court had already sat through 13 witnesses presented by appellant's counsel, of which more than half were irrelevant. During the questioning of many of these witnesses, counsel appeared to be on some sort of fishing expedition. And the court had already held appellant's counsel in contempt twice during the trial for failing to listen to the court's instructions and for obstructing the orderly administration of justice.[1] The court's patience was wearing thin. Had appellant's counsel been more effective in presenting his case, there is a greater possibility that the court would have granted his motion for a continuance.

{¶ 254} The Linville evidence had the potential to be exculpatory, especially coupled with the testimony of Todd's alleged confession. Had counsel been more effective throughout the trial and the motion hearing, this evidence could have been fully explored.

{¶ 255} Accordingly, appellant's third assignment of error is without merit.

{¶ 256} In sum, counsel's numerous errors throughout appellant's trial and motion-for-new-trial hearing resulted in both ineffective assistance of counsel and cumulative error warranting reversal. Counsel should have objected to the polygraph results. Counsel should have objected to the prosecutor's improper comments during closing arguments. Counsel should have investigated the Linville call. Counsel should have made a record of the potential shackle issue. Counsel should have ensured that Beaver was brought to the trial to testify. Counsel should have heeded the court's warnings. Counsel should have been more articulate in questioning witnesses and stuck to the relevant issues.

{¶ 257} Each error when viewed in isolation might not have prejudiced appellant's rights had each occurred in an otherwise fair trial. However, when we consider the errors as a whole, we are convinced that appellant did not receive a fair trial or a fair hearing on his motion for new trial. Appellant's 12th assignment of error asserting ineffective assistance of counsel has merit.[2]

---

1. See *In re Contempt of Kafantaris*, 7th Dist. No. 07–CO–28, 2009-Ohio-4814, 2009 WL 2917945, for the full details of the contempt findings.

2. It is of interest to note that as of April 1, 2009, the Ohio Supreme Court permanently disbarred appellant's attorney, George Kafantaris, from the practice of law for misappropriat-

{¶ 258} For the reasons stated above, appellant's conviction is reversed. This matter is remanded to the trial court for a new trial.

Judgment accordingly.

WAITE and DeGENARO, JJ., concur.

ing clients' funds, among other acts of misconduct. See *Trumbull Cty. Bar Assn. v. Kafantaris*, 121 Ohio St.3d 387, 2009-Ohio-1389, 904 N.E.2d 875.