[Cite as *State v. Spring*, 2017-Ohio-768.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 15 JE 0019 |
| VS. | ) | |
| | ) | OPINION |
| JEFFREY M. SPRING, SR. | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from the Court of
                               Common Pleas of Jefferson County,
                               Ohio
                               Case No. 15 CR 8

JUDGMENT:                      Affirmed.

APPEARANCES:
For Plaintiff-Appellee          Attorney Jane Hanlin
                                Jefferson County Prosecutor
                                16001 State Route 7
                                Steubenville, Ohio 43952

For Defendant-Appellant         Attorney Timothy Young
                                Ohio Public Defender
                                Attorney Allen Vender
                                Assistant Public Defender
                                250 East Broad Street, Suite 1400
                                Columbus, Ohio 43215

JUDGES:

Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

                                Dated: March 3, 2017

DeGENARO, J.

{¶1} Defendant-Appellant, Jeffery Spring, appeals the trial court judgment convicting him of murder, a firearm specification, tampering with evidence, and sentencing him accordingly. Spring asserts trial counsel was constitutionally ineffective. As Spring's assignment of error is meritless, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶2} Spring called 911 to report that he had killed Stephen Boyer; he had sustained two gunshot wounds and his body was found outside of Spring's home. Spring was indicted on one count of murder, R.C. 2903.02(A), an unclassified felony, with an attached firearm specification, R.C. 2941.145; and one count of tampering with evidence, R.C. 2921.12(A)(1). Spring made numerous inconsistent statements to police about the circumstances surrounding Boyer's death, regarding which defense counsel did not file a motion to suppress.

{¶3} The following facts were adduced during Spring's jury trial. Both Spring and the victim had been drinking alcohol on the day Boyer was killed; Spring estimated that he had consumed fifteen beers and Boyer's blood alcohol content upon his autopsy was .292. On the 911 call, Spring claimed Boyer was trying to break into his home while brandishing a knife and seemed to indicate that there was more than one person in his home when this attempted break-in occurred.

{¶4} When police arrived, they found Spring was the only one in the home. There was no sign of forced entry at his residence and no sign of a struggle inside of his home. Police located the victim's jacket and the victim's cell phone in Spring's living room.

{¶5} They found Boyer dead, having sustained gunshot wounds to the head and chest. His body was lying in front of Spring's front door; however, there was a bloodstain several feet away—not near the front door—that appeared to have been swept up with a broom. A bloodstained push-broom was also found outside.

{¶6} Officers placed Spring in the back seat of a cruiser and questioned him. After being provided with *Miranda* warnings, Spring stated: "I shot him once, went

outside and shot him again in the head to make sure he was dead."

**{¶7}** Officers observed the victim had a knife in his hand, but they also noticed that the placement of the knife seemed odd given the condition of the body and the gunshot wound suffered by the victim. The knife was recovered and sent to the BCI crime lab for processing. The only DNA recovered from the handle and the blade of the knife belonged to Spring; there was no DNA from the victim on that knife.

**{¶8}** Officers attempted to find the firearm used in the crime, a Smith and Wesson .38 revolver, and Spring made various claims as to where the weapon might be, first claiming it was in his bedroom, and later stating that it might have been in the couch. Officers later located the weapon during a search of the residence, inside of a concealed cabinet in the kitchen. The gun contained two spent shell casings and four live rounds.

**{¶9}** An autopsy of the victim's body resulted in a bullet being recovered from the victim's abdomen. That bullet was a .38 caliber bullet and additional testing by the crime lab resulted in the conclusion that the bullet found inside Boyer's body was fired from the .38 Smith and Wesson revolver found in Spring's kitchen.

**{¶10}** Approximately ten hours after he made the 911 call, Spring was interviewed by Sheriff Fred Abdalla while in sheriff's department custody; this interview was videotaped. Before questioning Spring, Abdalla provided him the *Miranda* warnings, and Spring indicated he understood his rights and wished to waive them.

**{¶11}** Spring admitted to the sheriff that he first shot the victim in the abdomen and then shot him again in the head. He explained he inflicted the second shot because he did not want to see the victim suffer. This statement by Spring matched the conclusions of the medical examiner, who indicated that the victim was alive when the shot to the head was fired. Spring also admitted he attempted to clean up the blood outside with a broom, and that he placed the knife in the victim's hand after he shot him.

**{¶12}** Spring elected to testify in his own defense at trial, claiming that he shot

the victim accidentally through his closed front door. Spring testified that he believed the victim had left the premises, and therefore did not think he would hit anyone when he fired his weapon through the door. Spring claimed that prior to the shooting there were only seven bullet holes in the front door, an assertion supported by the testimony of his son. After the shooting, investigators found there were nine bullet holes in the front door.

**{¶13}** Spring admitted he lied when he reported the victim broke into his house and had a knife.  Spring said he and the victim had been together at his home for approximately 30 to 40 minutes, when the two began to argue. At some point, he became agitated after observing his prescription medication bottles were moved; he suspected the victim had attempted to steal from him. He then pushed the victim out of his house. Subsequently, he shot two times through the closed front door.

**{¶14}** Spring said he discovered the victim's dead body outside when his dogs began to bark. Spring conceded he took the broom and was trying to sweep away the blood stains and that he also "got some disinfectant and sprayed it around" that area. Only after his attempt at cleaning up, did Spring call 911. As for the knife, Spring said he "subconsciously" planted it in the victim's hand. When asked by defense counsel whether he lied about the knife because he was afraid, Spring remarked: "I wasn't. I wasn't afraid."

**{¶15}** Upon cross-examination, Spring could not explain how the bullets would have taken a 90 degree turn once going through the door, to hit the victim where the bloodstain was found outside. Spring asserted that three separate law enforcement officers must have misheard him when they reported he said he shot Boyer once and then went out and shot him again in the head to make sure that he was dead. Spring was unable to explain his recorded statement to the sheriff, wherein he admitted that he shot the victim in the head because he "didn't want to see him suffer."

**{¶16}** Spring was found guilty by a jury on all counts and was sentenced to an aggregate prison term of 18-years to life.

## Ineffective Assistance of Counsel

{¶17} In his sole assignment of error, Spring asserts:

Jeffrey Spring received ineffective assistance of counsel because his attorney failed to file a motion to suppress his statements to the police, when he did not knowingly, intelligently, and voluntarily waive his Miranda rights; failed to object to prosecutorial misconduct in closing argument; and failed to object to witness opinion which was not based on firsthand knowledge or expertise.

{¶18} To prove ineffective assistance of counsel, the defendant must satisfy a two-prong test; that counsel's performance has fallen below an objective standard of reasonable representation, and that he was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), at paragraph two of the syllabus. To demonstrate prejudice, the defendant must prove that, but for counsel's errors, the result of the trial would have been different. *Id.*, paragraph three of the syllabus. In Ohio, a properly licensed attorney is presumed to be competent and the burden is on the defendant to prove otherwise. *State v. Hamblin*, 37 Ohio St.3d 153, 155, 524 N.E.2d 476 (1988).

## Failure to File a Motion to Suppress

{¶19} Spring first asserts that trial counsel was ineffective for failing to file a motion to suppress statements he made to law enforcement. Counsel's failure to file a motion to suppress does not constitute ineffective assistance of counsel per se. *State v. Brown*, 115 Ohio St.3d 55, 2007–Ohio–4837, 873 N.E.2d 858, ¶ 65, citing *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *Brown* at ¶ 65.

{¶20} Further, as this court has recently explained: "[I]n evaluating deficient

performance for failure to file a suppression motion, the court must consider whether counsel made a tactical decision. *Madrigal*, 87 Ohio St.3d at 389 (noting that a suppression motion is not without risks). Evidence that counsel fully investigated the case is relevant in this deficiency evaluation." (Internal citation omitted.) *State v. Albright*, 7th Dist. No. No. 14 MA 0165, 2016-Ohio-7037, ¶ 58-59.

**{¶21}** Spring asserts counsel should have filed a motion to suppress the statements he made to police at the scene and to Sheriff Abdalla during an interview at the department 10 hours later. He does not dispute that he was read his *Miranda* rights; rather, he claims he could not have validly waived those rights because he was intoxicated.

**{¶22}** "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination."  *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34 (2013); *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, "a suspect may then knowingly and intelligently waive these rights and agree to make a statement. If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." *Id.*, citing *Miranda* at 475, and *Colorado v. Connelly*, 479 U.S. 157, 168–169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

**{¶23}** To determine whether a valid waiver occurred, courts should " 'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *Wesson* at ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus; *see also Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

**{¶24}** In *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), the defendant was shot in the chest by police during the course of a bank robbery. He suffered a severe spinal cord injury, and upon admission to the hospital, was in

shock, cold and clammy, and his blood pressure was very low due to blood loss. According to a doctor, at the time of his admission to the hospital the defendant could not understand questions. However, after the defendant's blood pressure had improved, detectives questioned him about his involvement in the bank robbery. *Id.* at 165–167.

**{¶25}** The Supreme Court of Ohio upheld the trial court's denial of the defendant's motion to suppress, thus concluding his *Miranda* waiver was valid. *Id.* at 175. The Court noted that detectives received a doctor's permission to conduct the interview, which lasted no more than forty-five minutes, and that the defendant was conscious throughout. The defendant was able to converse in a normal voice and indicated he understood his rights and expressed a willingness to talk to police. The officers ceased their interrogation when the defendant indicated that he no longer wished to speak with them. *Id.* at 172–173.

**{¶26}** Other courts have addressed the more specific issue of the defendant's intoxication and its effect on the *Miranda* waiver. "The presence of drugs and/or alcohol does not render a statement inadmissible per se. * * * Rather, while their presence should be considered, 'the amount must sufficiently impair the confessor's ability to reason.' " *State v. Fairley*, 3d Dist. No. 5–03–41, 2004-Ohio-2616, ¶ 21, quoting *State v. Stewart*, 75 Ohio App.3d 141, 147, 598 N.E.2d 1275 (11th Dist.1991).

**{¶27}** In *Fairley*, the Third District held the defendant had validly waived his *Miranda* rights even though the defendant admitted he was drunk and had used cocaine earlier in the day and the deputy noted "moderate odor of alcoholic beverage" coming from the defendant, saw a can of beer between his legs, and noticed that his eyes were glassy and blood shot. *Id.* at ¶ 20. The panel reached this conclusion because according to the deputy, the defendant "did not appear to have trouble understanding any of his rights, did not act confused, did not have slurred speech, and did not exhibit any other signs of intoxication, such as difficulty standing, maintaining train of thought, and/or finishing sentences." *Id.* In addition, the deputy

said the defendant "indicated he understood each right read to him by the deputy, that he had no questions concerning these rights, and that he would be willing to waive those rights and talk to the deputy." *Id.*

**{¶28}** In *State v. West*, 2d Dist. No. 23547, 2010-Ohio-1786, ¶ 16-18, the Second District held that the defendant validly waived her *Miranda* rights even where her breathalyzer test produced a result nearly three times the legal limit. The court reasoned that the defendant "was not incoherent, disoriented, or losing consciousness or falling asleep inside the cruiser," and that the "evidence failed to demonstrate she did not understand her circumstances or what was going on, or that she did not respond appropriately to the officer's questions, she indicated to the officer that she understood the rights he read to her and that she was willing to waive them and talk to him." *Id.* at ¶ 18.

**{¶29}** Finally, in *State v. Stanberry*, 11th Dist. No. 2002–L–028, 2003-Ohio-5700, the defendant ingested nine Valiums, three doses of acid, and eight beers approximately five hours before waiving his *Miranda* rights and being questioned by police. The Eleventh District concluded there was no evidence to suggest that the defendant's ability to reason was sufficiently impaired so as to invalidate his *Miranda* waiver. *Id.* at ¶ 24-35.

**{¶30}** With the foregoing case law in mind, a motion to suppress Spring's statements to police would not have been successful. The first custodial statement Spring made was to three officers responding to Spring's house after his 911 call. These officers heard Spring state he had shot Boyer, and then went outside and shot him again to make sure he was dead. Spring testified that he had 15 beers on the day of the shooting, but conceded that he normally drinks 12 or 13 per day and had been doing so for at least a decade. He stated he was "pretty drunk" and had also been taking prescription painkillers and Zanaflex, along with Valium that day. One of the responding officers conceded Spring had an odor of alcoholic beverage and that his speech was slurred.

**{¶31}** However, we have the benefit of the 911 call audio recording as part of

the record, which Spring made shortly before those officers arrived. On the call, although Spring's speech does sound slurred, Spring was coherent and calm and was able to correctly report his name, address, phone number and the victim's name. The officers indicated that Spring was calm and appeared to be able to understand the questions asked of him.

**{¶32}** The lengthier custodial interview by Sheriff Abdalla took place 10 hours after Spring's arrest. This interview was videotaped and is part of the record. Spring appears coherent and mostly calm. He was not slurring his speech, and did not appear intoxicated. He was even able to correct Abdalla about the number of times he had been Mirandized. Abdalla stated that he was about to read him his rights for the third time, when Spring correctly noted that actually it was only the second time he had been Mirandized since being placed in custody for the homicide. Abdalla went through each of the Miranda rights and gave Spring the opportunity to ask questions about each. Spring indicated he understood the rights he would waive by making a statement. Further, Abdalla testified that Spring never claimed to need medication during the interview and denied that Spring appeared to be suffering from any type of memory loss or confusion.

**{¶33}** Based on these facts and the case law described above, a motion to suppress statements Spring made to police at the scene and to Sheriff Abdalla would not have succeeded. Counsel is not required to file meritless motions. Accordingly, counsel was not constitutionally ineffective in this regard.

### Failure to Object to Alleged Prosecutorial Misconduct during Closing

**{¶34}** Next, Spring asserts counsel was ineffective for failing to object to several alleged instances of prosecutorial misconduct during closing statements.

**{¶35}** The test regarding prosecutorial misconduct in closing statements is two-fold. A reviewing court must determine whether the remarks were improper, and if so, whether they prejudicially affected the substantial rights of the defendant. *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶36}** As this court has explained:

Parties have wide latitude in their closing statements, particularly "latitude as to what the evidence has shown and what inferences can be drawn from the evidence." *State v. Diar*, 120 Ohio St.3d 460, 2008–Ohio–6266, 900 N.E.2d 565, at ¶ 213. A prosecutor may state his opinion if it is based on the evidence presented at trial. *Id.* A prosecutor may not state his personal belief regarding the credibility of a witness. *State v. Jackson*, 107 Ohio St.3d 53, 2005–Ohio–5981, 836 N.E.2d 1173, at ¶ 117. However, a prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006–Ohio–18, 840 N.E.2d 151, at ¶ 116. A prosecutor may even point out a lack of credibility of a witness, if the record supports such a claim. *See State v. Powell*, 177 Ohio App.3d 825, 2008–Ohio–4171, 896 N.E.2d 212, at ¶ 45.

*State v. Wolff*, 7th Dist. No. 07 MA 166, 2009–Ohio–7085, ¶ 13.

**{¶37}** However, a prosecutor "may not make excessively emotional arguments tending to inflame the jury's sensibilities." *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001). Prosecutors may not deliberately saturate trials with emotion and obtain a conviction based solely on the inflammation of fears and passions, rather than proof of guilt. *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993).

**{¶38}** Spring first asserts that trial counsel was ineffective for failing to object to the prosecutor's comment during her rebuttal closing that Spring was "a snake."

I would say when you listen to his statement the night that he committed this crime you're listening to a drunk and a murderer. Today you just listened to a murderer which would bring me to the only thing that I agree with Mr. Miller about in this case. There is a snake in this

case and its name is Jeffrey M. Spring. Thank you.

**{¶39}** However, as Spring concedes, defense counsel had just characterized the victim as a snake, during an anecdote in his own closing:

> You're out on a little over 11 acres somewhere. Eleven some acres is what Jeff, Junior said. You're out there in the middle of the night and someone comes to the house. What happened in the house? Could it be that Mr. Boyer, yeah, was a thief, that he was in the room, that he was run out of the house?

> You know, I remember a long time ago that I lived out in the country in Muskingum County. We were playing ball outside and out in the middle there's a - - you look and there's a copperhead on the ground. I'll never forget. My mom came out and she had a hoe and she hit it and she hit it and she hit it and she hit it and she hit it and she hit it and she hit it until it was dead. There's a snake in this case that came to a place that he wasn't invited to where he didn't belong.

**{¶40}** When reviewed in the context of the entire closing statements of both parties, the comment calling Spring a snake does not rise to the level of misconduct; it was a reasonable rebuttal to defense counsel's closing statement.

**{¶41}** Second, Spring asserts it was improper for the State, during its rebuttal closing to point out to the jury that both sides may call witnesses. Again, the prosecutor was merely responding to statements made by defense counsel in his closing about how there were unanswered questions about white pills found next to the victim's body.

**{¶42}** Specifically, defense counsel stated in his closing: "Whose pills were outside in the cellophane? What did Jeff say was moved? His pill bottle. What was never sent to a lab? The pills. Whose were they? Who did they belong to?"

**{¶43}** During rebuttal, the prosecutor stated:

This issue about the drugs or the pills that were outside, first of all, the Defendant today said his pills were in bottles and the pills that are outside of his house are in some cellophane wrapper. So, who knows if they're the victim's or the Defendant's or one of his kids or one of the dirt-balls he claims his daughter brings around the house. Who knows who the pills belong to. We do know that there were no drugs in the victim's body whatsoever.

And you know who else has the right to call witnesses just as you heard today? The Defendant. Defense Counsel can call any witness that he wants. If he thought the pills were so important or he thought there was some other angle to look at things, they can bring you anybody that they want and they didn't.

{¶44} These remarks were not improper. At no point did the State shift the burden of proof to Spring and at no point did the State advise the jury that Spring had to testify on his own behalf.

{¶45} Further, given the overwhelming evidence against Spring, he cannot demonstrate he was prejudiced by the prosecutor's remarks. Thus, counsel was not ineffective with regard to its failure to object to these statements during closing arguments.

### Failure to Object to Improper Opinion Testimony

{¶46} Spring next asserts counsel was ineffective for failing to object to Sheriff Abdalla's testimony that he assumed the victim was returning from urinating outside Spring's house when he was shot by Spring. He contends his testimony constitutes improper opinion from a lay witness.

{¶47} "Witnesses must testify based on their personal knowledge." *State v. Robinson*, 7th Dist. No. 05 JE 8, 2007-Ohio-3501, ¶ 32, citing Evid.R. 602. Opinion testimony may be given by lay witnesses only when it is: (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. Evid.R. 701.

**{¶48}** Expert opinion may be given when the witness does not have firsthand knowledge of the matter, but the witness must be first qualified as an expert. Evid.R. 702(B).

**{¶49}** Spring takes issue with the following testimony from Sheriff Abdalla:

And what I noticed, where you saw that refrigerator in the picture, just straight ahead from that you go up a little grade. There's like a little road there and gravel and I could see where somebody was urinating and I'm — I'm assuming at that time that that's where the victim come out to relieve himself, come out of the house to relieve himself and as he stepped back down and come onto the porch and got to the refrigerator was where he was shot at and then moved over towards the door.

**{¶50}** This testimony was not improper. Abdalla responded to the scene of the homicide and was able to make observations. During his later interview of Spring, he told Spring that he observed a patch of urine near the house. Based upon the location of the urine and the location where the body found, Abdalla opined that the victim had gone outside to urinate when he was shot. This is rationally based upon Abdalla's perception and observation of the scene and is helpful testimony or the determination of a fact in issue. Evid.R. 701.

**{¶51}** Assuming arguendo defense counsel should have objected to this testimony, given the overwhelming evidence against Spring, and the fact that Abdalla's assumption had little bearing on Spring's guilt, the failure to object was not prejudicial.

**{¶52}** Spring also asserts counsel should have objected to Ohio BCI Special Agent's Edward Lulla's opinion testimony about blood stains and spatter at the crime scene, since the agent was never deemed an expert witness by the trial court. He takes issue with the following testimony:

Agent Lulla: * * *[T]here's some little drip stains which is blood being deposited on the ground as if somebody was walking, non - - just passive drops. They're not a blood spatter. It's just a blood-letting event like someone's been cut or wounded and the blood is just dripping.

Prosecutor: Okay. And that's different than what you describe as blood spatter.

Agent Lulla: Yes.

Prosecutor: Okay. How so?

Agent Lulla: Spatter is though some force behind the blood. A drip stain is just - - there's no force behind it. It's just falling.

Prosecutor: If I ask you if you were standing there and you were injured to the point that blood was - - would that be what you would describe as drips?

Agent Lulla: If I have a cut and I'm standing here and it's dripping out of my wound, that's just a drip* * * But if I would [ ] swing my arm it's going to spatter.

**{¶53}** Spring is correct that Agent Lulla was never deemed an expert witness by the trial court and that defense counsel could have objected to the quoted testimony.

**{¶54}** However, had the State so requested, Agent Lulla likely would have been deemed an expert by the trial court; it appears the State inadvertently failed to make such a request. Special Agent Lulla testified that he is assigned to BCI's crime scene unit and that he processes crime scenes for local agencies. He stated he had worked for BCI for 18 years and had been a law enforcement officer for 13 years prior to that. His report was admitted into evidence.

**{¶55}** Further, there is some precedent allowing for similar testimony by investigating officers even where they are not qualified as experts. In *State v. Griffin*, 1st Dist. No. C–020084, 2003-Ohio-3196, the First District held that a detective's opinion testimony that the blood on the defendant's shirt was consistent with "blow-

back" spatter from a gunshot wound, was admissible in murder prosecution because such testimony came while the detective was explaining what evidence led him to disbelieve defendant's story that victim had committed suicide, and the detective had personal knowledge of the investigation and was competent to testify about the meaning he attributed to the way the blood on defendant's shirt looked. *Id.* at ¶ 28-29, 31-35.

{¶56} Here, the photographs of the blood at the scene speak for themselves. They clearly depict various areas that appear to be blood drips versus splatters. This court concludes, based upon *Griffin*, that it was proper for Agent Lulla to provide opinion testimony about the blood spatter.

{¶57} And in light of the overwhelming evidence presented which supports Spring's guilt, there was no prejudice, even assuming counsel erred by failing to object to Agent Lulla's testimony.

### Cumulative Error

{¶58} Finally, Spring asserts that the cumulative effect of trial counsel's errors was prejudicial and requires a new trial. Under the doctrine of cumulative error, a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singularly. *State v. DeMarco*, 31 Ohio St.3d 191, 196–197, 509 N.E.2d 1256 (1987). This court has applied the doctrine to reverse based upon ineffective assistance of counsel only in exceptional situations where numerous errors by trial counsel permeated the trial proceedings. *See, e.g., State v. Irwin*, 184 Ohio App.3d 764, 2009-Ohio-5271, 922 N.E.2d 981, ¶ 257 (7th Dist.)

{¶59} Here, there were arguably only one or perhaps two minor errors made by counsel. The evidence against Spring, in contrast, was overwhelming. The cumulative error doctrine does not apply.

{¶60} In sum, based upon the foregoing, Spring's sole assignment of error is meritless. Accordingly, the judgment of the trial court is affirmed.

Waite, J., concurs.

Robb, P. J., concurs.