[Cite as *State v. Bankston*, 2021-Ohio-4332.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

LEONARD M. BANKSTON, SR.,
a.k.a. LEONARD MERCEDES
BANKSTON, SR.,

        Defendant-Appellant.

CASE NO. 2020-A-0005

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2017 CR 00658

## O P I N I O N

Decided: December 6, 2021
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Rick L. Ferrara*, 2077 East 4th Street, 2nd Floor, Cleveland, OH 44115 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Leonard M. Bankston, appeals his convictions for Murder, Felonious Assault, and Domestic Violence, following a jury trial in the Ashtabula County Court of Common Pleas. For the following reasons, we affirm the decision of the lower court.

{¶2} On January 24, 2018, the Ashtabula County Grand Jury issued an Indictment, charging Bankston with Murder, an unclassified felony, in violation of R.C.

2903.02(A); Murder (Count Two), an unclassified felony, in violation of R.C. 2903.02(B); Felonious Assault (Count Three), a felony of the second degree, in violation of R.C. 2903.11(A)(1); and Domestic Violence (Count Four), a felony of the third degree, in violation of R.C. 2919.25(A) and (D)(4).

{¶3} A trial was held on August 25 through September 6, 2019. The following pertinent testimony and evidence were presented:

{¶4} At approximately 1:45 p.m. on December 10, 2017, Ashtabula County Fire Department firefighter-paramedics Lieutenant John Paul and Nicholas Moon were dispatched to a home in response to a report of an "ill female," later identified as Sheila Pyles. They were met by Bankston, who lived in the home. According to Pyles' sister, Terry Towner, Pyles and Bankston had been in a relationship "on and off" for the past five years. Paul and Moon entered the upstairs master bedroom where Pyles was on the bed, unconscious and exhibiting slow breathing with "snoring respirations." They observed that her face was severely swollen and bruised and there was a wet spot on the bed where she had urinated. Moon testified that her pupils indicated severe head or brain trauma.

{¶5} According to Paul, Bankston stated that Pyles "had been like this for a day or two; that she had been out with some men and they dropped her off and this is what she's been like." Moon testified that Bankston had "mentioned that his girl was dropped off there the day before and that she was like this." A similar explanation was provided in the 911 call, in which Bankston told the operator: "All I know she got back to the house -- she was with two men. I kept asking, who was it, who was it? What did they do to you? Okay. She was bruised up." Both paramedics observed that Bankston had a calm

2

demeanor during their interactions with him. When police arrived, Paul asked them to speak to Bankston because with "the severity of the injuries" it "seemed clear she had been beaten."

{¶6} Patrolmen Christopher Defina and Donald Martin of the Ashtabula City Police Department were dispatched to the home for an overdose but observed serious physical injuries to the victim, including her eyes being swollen shut and heavy bruising, rather than signs of an overdose. Martin testified that Bankston did not inquire about Pyles' condition and appeared that he wanted to "leave" and "go the other direction away from us." Defina spoke with Bankston, inquired about what happened, and Bankston stated that the victim "went to turn a trick on Friday [December 8] and she came back like that."

{¶7} Defina and Martin entered the home and smelled a strong odor of cleaning agents. In one bedroom, later identified as belonging to Bankston's daughter, Defina observed "blood spatter" on the curtain, cardboard box, and mattress. Martin also testified that he saw what he "appeared to believe was blood splatter" on a cardboard box and bedding. Both men saw a "small pile of hair" in the corner of that room by the door. In the bathroom, Martin observed an open can of Comet cleaner and soap suds in the bathtub from cleaning agents. After exiting the house, Defina inquired further of Bankston regarding what had occurred and Bankston stated that they had gone to some bars the night prior, he went to a home to purchase marijuana while Pyles remained in the car, and when he came back outside, she "was beaten up in the car" and would not say who did it. Bankston told Defina the bedding from the bed where Pyles had been was in a garbage bag in the basement, where it was later located.

3

{¶8} William Felt, a detective with the Ashtabula Police Department, investigated within the home. He discussed bloodstain pattern analysis and the ability to determine the movements associated with the travel of blood. He testified that in the second bedroom, he observed various areas with staining that appeared to be blood, including on the radiator and curtains. He described blood stains on the curtain as a "rainbow effect" which could be castoff of blood. Aqueous Leuco Crystal Violet, or LCV, which is sprayed on surfaces and turns purple when blood is detected, presumptively determining the presence of blood, was utilized. Reactions from the LCV were present on the bedroom wall and the floor next to the closet, linens, suitcase, a cardboard box, as well as on the bathroom tub and a sheet in the basement.

{¶9} Lindsey Deetz, a forensic scientist at the Ohio Bureau of Criminal Investigation (BCI), testified that swabs taken from the cardboard box, ceiling, and wall in the second bedroom tested presumptive positive for blood. A brown sheet was presumptive positive for blood on only one stain. Two of 19 stains on one curtain tested positive for blood. Swabs from a tool and another curtain tested negative for blood.

{¶10} BCI forensic scientist Stacy Violi testified that the major DNA profile from the swabs of the suitcase, cardboard box flap, stains on the curtain, and the ceiling was consistent with Bankston's, indicating that the DNA profile was "rarer than 1 in 1 trillion unrelated individuals." Bedding contained DNA profiles of Pyles and Bankston. A sheet and the bathtub swab contained Pyles' DNA.

{¶11} Following the police response to the home on December 10, Bankston was transported to the Ashtabula Police Department, where he was questioned by Detective Michael Palinkas. During the interview, a video of which was played for the jury, Bankston

4

maintained that he and Pyles had gone out to bars on December 8, he had stopped for marijuana while Pyles remained in the vehicle, and when he returned to the car, she was not there. He went home and she arrived an hour later with injuries, stating that two men had forced her into a vehicle. According to Bankston, she appeared out of it but requested that he not seek medical treatment. He stated that he took her into the shower in an attempt to make her more coherent, but she was in and out of consciousness and slept for the following day, urinating in the bed and unable to speak to him. He called paramedics on December 10 when he saw "white stuff" coming out of her mouth. Bankston denied hitting Pyles or causing her injuries. Toward the conclusion of the interview, Bankston stated that while they were in the second bedroom, Pyles tried to leave and he grabbed her and attempted to hug her while she pushed away, causing her to fall. Palinkas described what he considered to be inconsistencies between the versions given by Bankston, including that he had not initially admitted in the first portion of the interview the altercation in the second bedroom. Palinkas testified that police did not find anyone in the area of the house on 43rd Street who could provide information regarding the alleged incident with the two men in the car.

{¶12} A complaint was filed against Bankston for Felonious Assault on December 11, 2017, and he was set to be arraigned on that date. Following another interview with Palinkas, arraignment occurred. Felt testified that he was present during arraignment and witnessed Bankston turn toward Pyles' family and state: "I'm sorry. I didn't mean for this to happen" three times.

{¶13} Joseph Cellitti, the former lieutenant in charge of the Ashtabula Police Department Detective Bureau, conducted an interview of Bankston following the

5

arraignment. In the interview, the video of which was played for the jury, Bankston stated that the two argued about Pyles being with the men, Bankston grabbed her, "smacked her on the side of her face" and hit her pretty hard. He stated that he then pushed her, she fell back onto the bed, and he hit her on the face again, which he described as a "smack." Bankston admitted that he hit her about four times. Cellitti testified that this differed from what Bankston had said in the prior interviews with Palinkas.

{¶14} On December 11, 2017, after receiving treatment at MetroHealth, Pyles passed away. Dr. David Dolinak, deputy medical examiner at the Cuyahoga County Medical Examiner Department, performed an autopsy. He observed contusions and lacerations to Pyles' face, chest, and arm, bruising on her scalp, and abrasions on her neck. He found bleeding in her brain, which was the result of an injury to her head, and pressure from the bleeding, which led to her suffering a stroke. She also had a fracture to her hyoid bone, which would be caused by impact or compression to the neck. He determined that the cause of death was blunt force injuries and classified the death as a homicide. He believed that the injuries were "fairly recent." Although the toxicology report showed cocaine in her system, he did not find that this contributed to her death.

{¶15} The jury found Bankston guilty of Counts Two through Four as charged in the indictment and not guilty of Count One. The verdict was memorialized in a September 10, 2019 Order and Journal Entry.

{¶16} Following a hearing on the issue of merger, the court issued a November 15, 2019 Judgment Entry in which it found the convictions for Murder and Felonious Assault merged but that the conviction for Domestic Violence did not. The State elected to proceed on the Murder offense.

Case No. 2020-A-0005

{¶17} A sentencing hearing was held and the sentence was memorialized in a December 23, 2019 Judgment Entry. The court sentenced Bankston to serve a prison term of 15 years to life for Murder and a consecutive term of 36 months in prison for Domestic Violence.

{¶18} Bankston timely appeals and raises the following assignments of error:

{¶19} "[1.] Defense counsel provided constitutionally ineffective assistance by failing to object to testimonial evidence regarding 'blood spatter' and 'castoff' without the requisite foundation or to unduly prejudicial interviews played for the jury at trial and failing to request an instruction on reckless homicide.

{¶20} "[2.] The trial court violated appellant's federal due process rights and rights under Ohio law by failing to allow a jury instruction as to involuntary manslaughter.

{¶21} "[3.] The manifest weight of the evidence did not warrant conviction for felony murder or felonious assault."

{¶22} For ease of discussion, we will first consider Bankston's third assignment of error. In this assignment, Bankston argues that his convictions for Felonious Assault and Felony Murder were against the weight of the evidence given the lack of witnesses and forensic evidence to show Bankston knowingly caused injuries leading to Pyles' death.

{¶23} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts

7

in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387.

{¶24} To convict a defendant of Felony Murder, the State is required to prove, beyond a reasonable doubt, that a person did "cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2903.02(B). For Felonious Assault, the State was required to prove that Bankston did knowingly "[c]ause serious physical harm to another." R.C. 2903.11(A)(1).

{¶25} In the present matter, the jury did not clearly lose its way in finding Bankston guilty of the offenses of Felonious Assault and Felony Murder. The evidence showed that Pyles experienced trauma to her head, leading to her death. Bankston's hands were shown to have cuts and swelling and his blood was located in the room where he admitted to having an argument with Pyles, stating that he hit her at least four times and pushed her on the bed. Although he stated that she had been injured by two unknown men, the details of this story changed throughout his statements to police officers, with him initially denying hitting Pyles to later admitting that he hit her several times. No evidence was found to corroborate the explanation that two men assaulted Pyles. Further, although Bankston stated that Pyles was "out of it" and unable to communicate with him, sleeping and urinating on herself for a period of at least a day and a half, he failed to seek treatment for her, which could contribute to a potential conclusion that he was trying to hide the fact that he had caused harm to the victim. The cleaning of the bathroom observed by the officers could also support this theory. Bankston's apologies to the family at arraignment

8

also weighed in favor of a finding that he knowingly committed serious harm to Pyles. Finally, there is no dispute that the serious physical harm caused to Pyles led to her death and, thus, supported the conviction for Felony Murder.

{¶26} While Bankston argues that he did not act with intent to kill or cause harm to Pyles, there were various facts in the record to dispute this contention. The degree of harm caused to Pyles was serious and, if it is believed it was committed by him, undercuts the theory that this was merely recklessness or a minor act of assault. Bankston's admission of hitting Pyles, combined with the other evidence outlined above, provided support for the convictions. The jury was best able to determine the credibility of Bankston's description of the events surrounding Pyles' death. *State v. Rice*, 2019-Ohio-1415, 135 N.E.3d 309, ¶ 84 (11th Dist.) ("[i]t is well-settled that when assessing the credibility of witnesses, '[t]he choice between the credibility of witnesses * * * rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact'") (citation omitted).

{¶27} Bankston's arguments that there were a lack of eyewitnesses and that his changes in his story were slight are unconvincing. It is unnecessary to have an eyewitness in order to obtain a conviction and it is frequently the case that no such witness exists. In relation to his contention that the changes in his story were minor, it must be emphasized that he went from denying any sort of contact with Pyles to describing an incident in which he hit her four times and pushed her. It was well within the jury's province to determine that it was more credible that he knowingly caused serious physical harm which led to her death given his behavior surrounding the incident, including failure to seek treatment while Pyles was unconscious and unresponsive and cleaning in several

9

areas while she was lying in bed dying.

{¶28} The third assignment of error is without merit.

{¶29} In his first assignment of error, Bankston argues that trial counsel was ineffective by failing to object to testimonial evidence regarding blood spatter or castoff without foundation, prejudicial interviews played for the jury, and by failing to request an instruction on reckless homicide.

{¶30} To demonstrate ineffective assistance of counsel, a defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. "There is a strong presumption that the attorney's performance was reasonable." *State v. Gotel*, 11th Dist. Lake No. 2006-L-015, 2007-Ohio-888, ¶ 10.

{¶31} Bankston first argues that trial counsel was ineffective by failing to object to officers giving testimony regarding blood spatter and castoff since they were not experts in this area. In particular, he emphasizes the testimony of Felt that "you'll see kind of a rainbow effect of some kind of dark stains here, which is indicative it could probably be a castoff of blood onto the curtain."

10

{¶32} We will first address Felt's statements since they opined as to the cause of the blood stains, noting that they were "castoff" or from a moving source of blood. The court did not state that it found Felt to be an expert on blood spatter or blood analysis, nor did trial counsel object on the grounds that testimony was given on issues requiring an expert, although we note "a trial court is not required to expressly state on the record that the witness is qualified as an expert prior to that witness offering opinion testimony." *State v. Waskelis*, 11th Dist. Portage No. 2011-P-0035, 2012-Ohio-3030, ¶ 64. Courts have found that detectives or other investigators can opine on issues such as blood spatter, either as an expert or a lay witness giving opinion testimony pursuant to Evid.R. 701. *See State v. Griffin*, 1st Dist. Hamilton No. C-020084, 2003-Ohio-3196, ¶ 35 ("Detective Diersing had personal knowledge of the investigation and was competent to testify about the meaning he attributed to the way the blood on [the defendant's] shirt looked"); *State v. Spring*, 2017-Ohio-768, 85 N.E.3d 1080, ¶ 52-56 (7th Dist.) (although not qualified an expert, a BCI agent's opinion testimony about blood spatter where he had been assigned to the crime scene unit, processed crime scenes, and had worked at BCI and in law enforcement for 30 years was proper); *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 48 (finding no plain error where a detective was permitted to testify about blood spatter, was not questioned about his professional qualifications, but his responsibilities were to "handle, collect, and process the [crime] scene for any physical evidence * * * that may be pertinent to the investigation"). Significantly, Felt testified as to qualifications relevant to his testimony, including a 20-year background in law enforcement, duties performed for the Ashtabula Police Department performing bloodstain analysis, and receiving specialized training in crime scene investigation. He

11

briefly opined on what the blood indicated consistent with his observations and training. We do not find that the failure to object to such testimony constituted ineffective assistance of counsel, emphasizing that it has been held, in similar circumstances that, "[g]iven the strong presumption that counsel's performance constituted reasonable assistance * * * counsel's failure to object may have been a tactical decision." *Id.* at ¶ 51. In *Thomas*, the court recognized that, by not challenging the detective's qualifications, this may have avoided the prosecutor bolstering such qualifications. *Id.* As to any of the officers who testified regarding blood evidence in this matter, further questioning may have provided more evidence of their experience and training in dealing with blood evidence, thereby further emphasizing their testimony and credibility relating to their observations.

{¶33} The testimony of other officers generally referenced "blood spatter" or spots observed in the bedroom, but did not elaborate with blood spatter or bloodstain analysis, nor does Bankston point to any particular objectionable statements they made. While the officers offered their observations of the scene, they generally did not testify as to what occurred in the bedroom to cause the blood spatter or the cause of any pattern or direction of the blood. The jury was able to listen to all of the evidence, including the officers' testimony that they saw what appeared to be blood drops, confirmation of blood presence by BCI, the fact that this blood primarily belonged to Bankston, and Bankston's admission of hitting Pyles in the room where the blood was located, in order to determine the relevance of this blood evidence, the value of the testimony, and whether it supported the State's theory that Bankston assaulted Pyles in the bedroom. Further, Bankston's objections to the State's overall theory of the case that the assault occurred in the

12

bedroom and assertions that the blood evidence did not support this outcome are undercut by Bankston's admissions that he hit Pyles at least four times in the bedroom and the injuries observed to his hand which could have explained the presence of his blood in that room.

{¶34} Bankston next argues that trial counsel should have objected to playing video of him during two jail interviews wearing his jail attire, i.e., a striped top and matching pants and handcuffs, rather than admitting transcripts or audio of the interviews, emphasizing authority stating that the requirement for a defendant to appear at trial in restraints is an "inherently prejudicial practice." *See Holbrook v. Flynn*, 475 U.S. 560, 568-569, 106 S.Ct. 1340, 89 L.Ed.2d 525.

{¶35} It has been recognized that case law addressing the jury viewing a defendant in jail clothing and shackles generally relates to the defendant's appearance in courtroom proceedings and such precedent is "not directly applicable" where a video of the defendant in such attire during out of court events like a polygraph examination was shown at trial. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 32. Some of the concerns of allowing a defendant to appear during trial in jail clothing, such as maintaining the dignity of the judicial process and avoiding the hindrance of the ability to communicate with one's attorney, do not apply here since the defendant appeared in such attire and handcuffs only in the interviews. *See id* at ¶ 31-32.

{¶36} In *State v. Cline*, 11th Dist. Trumbull No. 2007-T-0052, 2008-Ohio-1500, this court held that playing two videos of interviews with a defendant in jail clothing was not reversible error, noting that the jurors had been advised the defendant was in custody when he gave the interviews and "even if we were to find that it was error to admit such

13

a video, the error would be harmless since the jurors were well aware of his custody status at the time of the interview." *Id.* at ¶ 39. Bankston emphasizes that he appeared in interviews two and three in restraints and jail clothing. In their testimony, the interviewing officers clearly explained that these interviews were conducted just prior to and after arraignment, indicating that Bankston had been charged with a crime relating to these offenses. In *Cline*, this court also noted authority for the proposition that allowing jurors to view a defendant charged with a crime in jail clothing is harmless error since "no prejudice can result from seeing that which is already known." (Citation omitted.) *Id.*, citing *State v. Bell*, 4th Dist. Scioto No. 96CA2472, 1997 WL 317425, *4 (June 6, 1997), citing *Estelle v. Williams*, 425 U.S. 501, 507, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The jurors were aware that Bankston was charged with a crime at that time and it follows that his appearance in these videos during the time surrounding the arraignment would be in jail clothing. As this court has observed, the prejudicial effect of having the jurors view a defendant in an interview wearing jail clothing does not outweigh the probative value of the defendant's admissions to conduct constituting the crime for which he is charged. *Cline* at ¶ 40.

{¶37} Furthermore, we emphasize that the standard here is whether trial counsel was ineffective. It has been observed that there are legitimate reasons of trial strategy to allow the juror to see the defendant in jail clothes, such as to elicit sympathy, that an appellate court will not second guess. *See State v. Levingston*, 5th Dist. Richland No. 17CA6, 2017-Ohio-7032, ¶ 35; *State v. Miller*, 1st Dist. Hamilton No. C-010543, 2002-Ohio-3296, ¶ 26. Here, while Bankston argues that counsel should have objected to a video interview, as an audio interview would have sufficed and avoided showing him in

14

jail attire, it appears counsel found a benefit from showing the video of the interview, arguing during closing argument that he encouraged jurors to look at the tape "and see how Mr. Bankston reacted when he found out that Sheila had died." We cannot second-guess defense counsel's potential strategy for choosing not to object to the video on the grounds that Bankston was in jail attire.

{¶38} Bankston next argues that trial counsel was ineffective by failing to object to "grossly, prejudicial comments expressing the opinions of law enforcement members." He contends that counsel should have objected to portions of the interview video showing law enforcement officials "vouching for their own case" and making statements to Bankston that expressed their opinion he was lying, had been inconsistent in his statements, and that the jury would not believe his story.

{¶39} The interviewing officers, both during the interview and in their testimony, made statements that Bankston gave inconsistent versions of the events leading up to Pyles' death. These statements merely recognized the fact that Bankston was indeed inconsistent during his interview and, in fact, at least one version of these events could not be entirely truthful. We do not find ineffectiveness in failing to object to the admission of these statements. It is evident that counsel was pursuing a strategy to discredit or mitigate the admissions made by Bankston, including a line of questioning to Palinkas regarding his interviewing techniques and whether he used misleading techniques to elicit a confession. Allowing the admission of statements made by Palinkas during the interview provided the grounds for this line of questioning. Again, we decline to second-guess matters of trial strategy.

{¶40} Bankston also contends that statements made in the interviews by officers

15

commenting on the strength of the evidence constituted impermissible vouching for the State's case.  However, the authority cited relates to prosecutors commenting to the jury on the credibility of the witnesses, which is not the issue raised by Bankston here.  *See United States v. Young*, 470 U.S. 1, 11, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).  Further, as noted above, defense counsel chose to take the opportunity in cross-examination to question the accuracy of the statements and the merits of the interviewing techniques utilized.

{¶41}  Even presuming counsel should have requested the redaction of certain statements made by officers, as it did with some other statements in the interviews, we do not find prejudice warranting reversal would result.  As the Ohio Supreme Court has noted, where "the jury was fully aware * * * [that] the officers were engaged in the interrogation of a criminal suspect * * * the impact on the average jury would have been much less than the same statements made by a police officer on the witness stand at trial."  *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 136, citing *State v. Kidder*, 32 Ohio St.3d 279, 285, 513 N.E.2d 311 (1987).  Given that many of the statements made were subsequently presented as testimony and/or were consistent with what the evidence did demonstrate, and in light of the limited prejudicial effect of statements made by police during an interview, we do not find the admission of any statements made during the interrogation led to a result that would be different than had they been excluded.

{¶42}  Finally, Bankston argues that counsel erred by failing to request a lesser-included instruction on reckless homicide, given the admissions in the interviews that

16

Bankston slapped the victim but denied hitting her hard enough to kill her or having intent to cause her death.

{¶43} "[T]he Supreme Court of Ohio has stated that the '[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel.'" *State v. McEndree*, 2020-Ohio-4526, 159 N.E.3d 311, ¶ 86 (11th Dist.), citing *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996) ("[t]he record may reveal that trial counsel did not request a certain jury instruction, but, without more, the court of appeals would have to guess as to why trial counsel did not make the request"); *State v. Williams*, 11th Dist. Ashtabula No. 2020-A-0033, 2021-Ohio-1256, ¶ 40. While it is not evident from the record why counsel chose to pursue an involuntary manslaughter lesser-included instruction rather than a reckless homicide one, we are reluctant to second-guess counsel's decisions on which lesser included instructions to seek, if any.

{¶44} Nonetheless, even presuming counsel should have sought such an instruction, we do not find that prejudice resulted from the failure to request a jury instruction on reckless homicide.

{¶45} An instruction on a lesser included offense must be given to the jury "'where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.'" *State v. Hall*, 11th Dist. Trumbull No. 2017-T-0032, 2019-Ohio-1719, ¶ 26, quoting *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. Of note, the Ohio Supreme Court has held that reckless homicide is not a lesser included offense of felony murder, for which Bankston was ultimately convicted. *State v. Owens*, 162 Ohio St.3d

17

596, 2020-Ohio-4616, 166 N.E.3d 1142, ¶ 1. Even presuming, however, that the instruction should have been requested under these circumstances and that the conduct could have justified both an acquittal for felony murder and a conviction on reckless homicide, this court has repeatedly held that "'when a conviction for the charged offense was supported by sufficient evidence, the failure to give a lesser-included offense instruction is harmless, since the result of the proceedings would not have been different but for the lack of the instruction.'" *State v. Hall*, 11th Dist. Lake Nos. 2019-L-027 and 2019-L-031, 2019-Ohio-4000, ¶ 26, citing *State v. Jevnikar*, 11th Dist. Lake Nos. 2016-L-006 and 2016-L-007, 2016-Ohio-8113, ¶ 19; *State v. Whitman*, 11th Dist. Ashtabula No. 2013-A-0031, 2013-Ohio-5822, ¶ 47; *Williams* at ¶ 35. As outlined above, the conviction for Felony Murder was supported by the manifest weight of the evidence given the substantial evidence including Bankston's own admission that he hit the victim and failed to seek treatment for her although she was clearly in grave physical distress, and thus, there was sufficient evidence to support such conviction as well. *See State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32. As such, there is no reason to conclude the outcome would have been different had a lesser-included instruction been given.

{¶46} The first assignment of error is without merit.

{¶47} In his second assignment of error, Bankston argues that the trial court violated his due process rights by failing to allow the requested Involuntary Manslaughter instruction.

{¶48} "An appellate court reviews a trial court's refusal to give a requested jury instruction for an abuse of discretion." *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467,

18

Case No. 2020-A-0005

¶ 36 (11th Dist.), citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240. An abuse of discretion occurs when the trial court fails "to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶49} This court has held that Involuntary Manslaughter is a lesser-included offense for both Murder and Felony Murder. *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, ¶ 135. Under the facts of the case, Bankston essentially contends that he could have been convicted of Involuntary Manslaughter if it was believed that he caused Pyles' death but did not commit a first- or second-degree offense of violence as is required for a Felony Murder conviction. The evidence does not demonstrate a version of events supporting a conviction for Involuntary Manslaughter, given that, at the least, under Bankston's admissions, he hit Pyles four times and pushed her on the bed. If this caused her death, then a conviction for Felonious Assault would be proper because he knowingly committed this assault, leading to serious physical harm. It is evident that minor contact such as a slap to the face did not cause the death, given Dr. Dolinak's testimony that Pyles died from blunt force trauma to her head.

{¶50} Bankston argues that the failure to give the instruction for Involuntary Manslaughter violated his due process rights as such an instruction "would have allowed him to fully present a conflicting defense theory" and that, without the instruction, he was "denied the chance to fully admit that domestic violence occurred due to his admission of slapping Pyles." The decision not to give the instruction was not made until after the defense rested, so it is unclear how he was denied the chance to admit that domestic violence occurred.

19

Case No. 2020-A-0005

{¶51}  The second assignment of error is without merit.

{¶52}  For the foregoing reasons, Bankston's convictions for Murder, Felonious Assault, and Domestic Violence in the Ashtabula County Court of Common Pleas are affirmed.  Costs to be taxed against appellant.


CYNTHIA WESTCOTT RICE, J.,

THOMAS R. WRIGHT, J.,

concur.

20